Alfred Brian MITCHELL, Appellant,

v.

STATE of Oklahoma, Appellee.

No. F–92–678.

Court of Criminal Appeals of Oklahoma.

Oct. 18, 1994.

Order Denying Rehearing and
Directing Issuance of Mandate Dec. 6, 1994.

District Court of Oklahoma County, Case No. CF–91–206.[1] He was convicted of First Degree Malice Aforethought Murder in violation of 21 O.S.1991, § 701.7, Robbery with a Dangerous Weapon, 21 O.S.1991, § 801, Larceny of an Automobile, 21 O.S.1991, § 1720, First Degree Rape, 21 O.S.1991, §§ 1111, 1114, and Forcible Anal Sodomy, 21 O.S. 1991, § 886. The jury found 1) the murder was especially heinous, atrocious, or cruel; 2) the murder was committed for the purpose of avoiding or preventing lawful arrest or prosecution; and 3) there was a probability that Mitchell would commit criminal acts of violence that would constitute a continuing threat to society. Mitchell was sentenced to death for the murder conviction, thirty years for robbery, twenty years for larceny, one hundred years for rape, and twenty years incarceration on the sodomy charge. From these convictions Mitchell has perfected his appeal, raising thirty-four propositions of error.

Mitchell was released from the Lloyd Rader Center juvenile correctional facility when he reached his 18th birthday on December 23, 1990.[2] He returned to his family home in Oklahoma City, near the Pilot Recreation Community Center [Center]. The Center served disadvantaged youth in the neighborhood of 1435 N.W. Second Street. Elaine Scott, a student at the University of Oklahoma, volunteered at the Pilot Center and was at work with the Center's director, Carolyn Ross, on January 7, 1991. The Center's roof was leaking badly due to earlier heavy rains and ice storms; the Center gym was closed. About 1:35 p.m., as Ross left the Center, she met Mitchell in the hallway. They had a brief discussion during which Ross explained she was leaving but that Scott could show Mitchell the Center library. Allen Biggs, an Oklahoma City [City] municipal roofing crew supervisor, arrived at the Center about 1:45 to check on the roof leaks. Mitchell met Biggs at the door and told him they were cleaning bathrooms, the Center

Jim Rowan, Melody Brannon, Asst. Public Defenders, Oklahoma City, at trial and Carolyn L. Merritt, Asst. Public Defender, Oklahoma City, on appeal, for appellant.

Don Deason, Steve Deutsch, Asst. Dist. Attys., Oklahoma City, at trial, Susan Brimer Loving, Atty. Gen. of Oklahoma, and William L. Humes, Asst. Atty. Gen., Oklahoma City, on appeal, for appellee.

## OPINION

CHAPEL, Judge:

Alfred Brian Mitchell was tried by jury before the Honorable Daniel L. Owens in the

1. Jury trial was held June 15–26, 1992, from which this appeal was perfected and became at issue on March 11, 1994.

2. Mitchell had been incarcerated at the Center for approximately three years. He was adjudicated a youthful offender for the rape of a neighborhood twelve-year-old girl. Evidence of that crime was admitted during the second stage as proof of both avoiding arrest and continuing threat.

was closed, and that a City crew had already placed trash buckets under the gym roof leaks. Biggs testified he felt Mitchell did not want him to enter the Center. Between 1:00 and 2:00 p.m., Velma Kibbey saw a black man in a red[3] knit cap leave the Center in Scott's car. Jessie Richards and another City worker reached the Center about 2:20; they entered the deserted Center, went straight to the gym, and spent about half an hour mopping and setting out buckets. Ross returned about 2:50 p.m. She noticed the door was not properly fastened, called out for Scott, and, through the glass in the office door, saw Scott's nude body facedown in a pool of blood. Scott's car was abandoned several blocks away.[4]

During that day's investigation Billy Tuimalu directed police to Mitchell, saying Mitchell, wearing white tennis shoes and a red or orange cap, had been at the Center that day. Mitchell confirmed that he had been there and told police he had seen two older black men at the Center "messing with" Scott. Mitchell accompanied police to the Oklahoma City Police Department drunk tank and various homeless shelters, trying to identify the men. Mitchell denied being in the Center's office, gave the officers his white Troop tennis shoes for testing, and agreed to come with his mother to the police station the next morning to give a formal statement and further descriptions of the men. At Mitchell's request, officers transported the two to the station on January 8. While his mother waited, Mitchell waived his *Miranda* rights, repeated his information from the previous day, then over several hours gave several stories to the officers. These stories culminated in admissions of presence at the scene and guilt which stopped short of confessing to murder; Mitchell insisted that another man who acted

with him had killed Scott and denied any sexual acts. Forensic evidence connecting Mitchell to the crime included: (1) bloody footprints matching his tennis shoes (from Scott's blood), (2) hair and fiber evidence, (3) sperm and various types of blood evidence.[5] Mitchell's finger had a recent injury, and he admitted injuring it at the scene.

### PRETRIAL ISSUES

Mitchell's first three propositions turn on his contention that he requested an attorney during questioning. Mitchell's January 8 statements began at about 11:00 a.m. and were videotaped. The first tape, which is four hours long, ends abruptly as Mitchell and Officer Maddox discuss body sample and search waivers. The second tape begins with Mitchell's final story regarding the events at the Center. Testimony at trial and in the *Jackson–Denno*[6] hearing estimated a gap of perhaps 45 minutes between the two, during which a forensic chemist obtained body samples from and three officers had a brief conversation with Mitchell.

Although he was given, and waived, his *Miranda* rights at the outset, the record shows that Mitchell was not a suspect when questioning began. Over the course of the first tape his status changed as his stories kept changing and as officers became aware of forensic evidence linking Mitchell to the scene. Near the end of the first tape Maddox told Mitchell that although he was still considered a witness he was too involved to be allowed to leave and would be jailed in connection with the homicide. Maddox and Mitchell's testimony agreed that, after that tape ended, Mitchell asked, "Do I need an attorney?" or "Do you think I need an attorney?" Maddox testified he replied that the

---

**3.** Kibbey told officers that the cap was a dark "funny color" red. She testified at trial the cap was green, but admitted she could not remember, and it could have been red. Mitchell wore a dark blue and orange cap.

**4.** The only fingerprints found on the car matched Andre Wilson, who testified that he broke into the car after it was abandoned. Wilson saw Mitchell walking away from the car.

**5.** In addition to other evidence, four fibers consistent with Mitchell's coat were found on Scott's

body, Mitchell's blood was on Scott's panties, inside her jeans, and the back of her shirt, and sperm consistent with Mitchell was on Scott's panties and shirt sleeve and recovered from an anal swab.

**6.** *Jackson v. Denno*, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964) established a defendant's right to an *in camera* hearing on the voluntariness of his confession.

decision was Mitchell's and he could not advise him. Mitchell's *Jackson–Denno* testimony was that Maddox told him he did not need an attorney because they would work out a deal; at trial he testified Maddox told him he did not need an attorney because he was too deep in the crime.

In his first proposition Mitchell claims he was denied his Fifth Amendment right to counsel when police refused to honor his request for an attorney. Mitchell contends that his question, "Do I need an attorney?" was an equivocal statement invoking his Fifth Amendment right to counsel. He asserts that questioning should have ceased except for purposes of clarification and therefore his statements are inadmissible. This claim would appear to apply only to the statements given in the second tape, as the question was not asked until after the first tape ended.

■ Neither the United States Supreme Court nor this Court has ruled on this precise issue. In the one Oklahoma case cited by Mitchell, the defendant said he'd rather talk to an attorney than police, and this Court found that neither ambiguous nor equivocal.[7] When considering ambiguous statements one should look at whether they precede a defendant's purported request for counsel or are part of the request itself.[8] The Supreme Court has recently held that after a knowing and voluntary waiver of *Miranda* rights, law enforcement officers may continue questioning through equivocal statements until a suspect clearly requests an attorney; although the Court suggests it is good police practice to clarify any equivocal statement, this is not required.[9] We need not reach this issue as Mitchell's statement does not rise to the level of an equivocal request for counsel.

■ Mitchell's question "Do I need an attorney?" is not a request for counsel. Under certain circumstances this question could amount to a request for counsel—if the defendant is young, inexperienced or unfamiliar with the criminal justice system, of low intelligence, mentally disabled or ill, or overwhelmingly upset or overwrought. None of those concerns are relevant here. Mitchell had just turned 18 but he was familiar with the criminal justice system through the juvenile courts. He was twice picked up for offenses before his arrest and adjudication on the rape charge, he had the benefit of counsel for that charge, and he had been given *Miranda* warnings at that time. His taped statements clearly indicate that he was in over his head during questioning. However, his statements do not support his claim that he wanted a lawyer or that he did not wish to continue talking when he made the statements on the second tape. Trial testimony showed Mitchell is of at least average intelligence, has completed his GED, and has some writing ability. There was no indication of mental problems. The circumstances here indicate that the statement was neither equivocal nor ambiguous, was certainly not an unequivocal request for counsel, and did not invoke Mitchell's right to counsel.[10]

■ In his second proposition Mitchell claims that evidence from the search waiver and body samples should have been suppressed because his consent was obtained without benefit of counsel. This proposition fails with Proposition I. Mitchell claims that because the body samples were taken and search waiver signed after his question, "Do I need an attorney?", the search evidence should be suppressed. Again, this proposition appears to go only to the clothing recovered from Mitchell's house and his hair, blood, and saliva samples. The Troop tennis shoes he gave to police on January 7 and the

7. *Booker v. State,* 851 P.2d 544 (Okl.Cr.1993).

8. *Smith v. Illinois,* 469 U.S. 91, 105 S.Ct. 490, 83 L.Ed.2d 488 (1984).

9. *Davis v. State,* —— U.S. ——, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994).

10. Mitchell claims that any error here could not be harmless under *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). In fact, even if this Court found error, the only statements excluded would be those from the second tape; Mitchell has not argued that the first tape should be excluded. It is entirely possible a jury could have disregarded the second tape, given the first tape and Mitchell's trial testimony, when voting to convict.

clothes he wore when booked were not among the evidence obtained by the search and samples. The question at issue did not invoke Mitchell's right to counsel, therefore his subsequent waiver and consent were not tainted and this proposition must fail.

▇ Mitchell argues in the alternative that his counsel's failure to object to the admission of this evidence amounted to ineffective assistance. Counsel did object generally to admission of any evidence from the statements but did not object to this evidence specifically and objected to very little evidence offered by the State at trial, including Mitchell's clothing and various hair, blood and sperm evidence. This was clearly part of a trial strategy in which Mitchell and counsel admitted his presence at the scene while offering an alternative explanation for the crime. Mitchell shows neither that counsel's performance was so deficient he was denied a fair trial or the right to effective counsel, nor that, but for counsel's conduct, the result of the trial would have been different.[11] Indeed, given (1) the abundance of witnesses and forensic evidence placing Mitchell at the scene, (2) his own statements and (3) his apparent insistence on testifying, this was probably the most credible strategy counsel could use.

▇ In proposition three Mitchell claims the trial court erred in finding Mitchell's confessions were knowingly, intelligently and voluntarily given and in permitting the jury to hear evidence of the confessions. The proposition seems to go only to that portion of the confession taped after Mitchell asked if he needed an attorney. During the second tape Mitchell abandoned his story of two black men who did everything, and admitted participation in a robbery and assault on Scott, while insisting that another man (not mentioned in the first tape) bore the greater

responsibility and delivered the fatal blows. Insofar as the proposition relies on the theory that Mitchell requested counsel before the second taped statement, it must fail.

▇ Mitchell also argues more generally that his confession was the product of coercion. A confession is voluntary if it is the product of the maker's free and unconstrained choice, and courts should look to the totality of the circumstances surrounding the confession, including the character of the defendant and the details of the interrogation.[12] The trial court must determine whether a defendant actually invoked his right to counsel; if so, any response to further questioning will be admissible only if the defendant initiated further discussion and knowingly and intelligently waived the right he had invoked.[13]

▇ Mitchell did not invoke his right to counsel between the first and second taped statements, nor did he request counsel when he was informed of his *Miranda* rights before questioning began. Mitchell concedes that when he was read his rights, signed a waiver, and agreed to talk to police, he was not a suspect and was free to leave. As the interview progressed Maddox asked Mitchell at least twice if he wanted time to think, and left Mitchell alone in the interview rooms two or three times. Mitchell always insisted he did not want time to think. He persisted in giving the officers explanations and became angry when they would not let him finish or interrupted him. Several times he said he did not know or understand what the officers wanted, but this was always in response to their comments that they believed he was lying. Although Mitchell's demeanor is somewhat more subdued on the second tape, it is much shorter than the first and his moods changed throughout the course of the first tape.[14]

---

11. *Liles v. State,* 702 P.2d 1025, 1034 (Okl.Cr. 1985), *cert. denied,* 476 U.S. 1164, 106 S.Ct. 2291, 90 L.Ed.2d 732 (1986); *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

12. See, e.g., *Salazar v. State,* 852 P.2d 729 (Okl. Cr.1993); *Crawford v. State,* 840 P.2d 627 (Okl. Cr.1992); *Castro v. State,* 745 P.2d 394 (Okl.Cr.

1987), *cert. denied,* 485 U.S. 971, 108 S.Ct. 1248, 99 L.Ed.2d 446 (1988).

13. *Pickens .v. State,* 850 P.2d 328 (Okl.Cr.1993), cert. denied, —— U.S. ——, 114 S.Ct. 942, 127 L.Ed.2d 232 (1994); *Walker v. State,* 795 P.2d 1064 (Okl.Cr.1990).

14. Mitchell's claims that he was a young, inexperienced offender have very little support in the

Mitchell's argument must finally fail because he cites no instances of coercion, relying only on a picture of a pitifully confused defendant. Even were this description correct, any confession is voluntary absent coercion.[15] Mitchell's worst accusation here appears to be continued interrogation. This simply is not coercion and cannot be used to support this claim.

## ISSUES REGARDING JURY SELECTION

Mitchell argues in proposition four that the trial court abused its discretion by denying complete and full voir dire on the death penalty issue. He claims he was not allowed to sufficiently and intelligently exercise his challenges for cause. Although neither party raises the problem of waiver, Mitchell has waived this issue as well as the issue in proposition five. When a defendant neither uses all his peremptory challenges nor makes a record of what jurors he would challenge were he able, he waives any claims regarding impartiality or improper makeup of the jury.[16] Mitchell waived peremptory challenges four through nine and thus fails to show prejudice from any errors in jury selection.

The purpose of voir dire is to uncover actual and implied bias, enabling counsel to intelligently use peremptory challenges to remove jurors.[17] Defense counsel has a duty to use voir dire to discover facts affecting juror qualifications.[18] The manner and extent of voir dire is within the discretion of the trial court and will not be disturbed on appeal absent a clear abuse of discretion.[19]

Mitchell complains specifically about questioning directed to seven jurors. One, Juror Smith, was properly excused for cause over Mitchell's objection when he told the trial court he could not impose the death penalty. The trial court sustained an objection to at least one question asked of each of the other jurors. The record clearly reflects that counsel was able to ask each of these jurors several other questions about the imposition of the death penalty. Counsel must be permitted voir dire full enough to identify jurors who would automatically convict, give the death penalty, acquit, or impose a life sentence, and the record here reflects adequate if not ample opportunity to discover that information.[20]

In his fifth proposition Mitchell argues the trial court should have granted his motion to quash the jury panel where certain cognizable classes of citizens were directly or indirectly excluded from the pool of jurors in violation of the state and federal constitutions. A criminal defendant is entitled to a jury panel which represents a fair cross-section of the community. Mitchell claims that his Oklahoma County venire did not represent a fair cross-section of the community because it was drawn from drivers' license lists and no effort was made to compel compliance with jury summons. As discussed above, Mitchell has waived this issue since he can show no prejudice.

In order to prove a systematic exclusion, a defendant must show (a) that the group alleged to be excluded is a distinctive group in the community; (b) that the repre-

---

record. Mitchell uses his request to talk to his mother to bolster his picture of youthful confusion. This Court has held that a defendant's request for a parent does not amount to a request for counsel, *Robedeaux v. State*, 866 P.2d 417 (Okl.Cr.1993), and the tape does not support the inference that Mitchell wanted to see his mother for legal assistance or support.

**15.** Cf. *Colorado v. Connelly*, 479 U.S. 157, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986) (confession of mentally ill person voluntary absent coercion); *Fontenot v. State*, 881 P.2d 69 (Okl.Cr.1994).

**16.** *Woodruff v. State*, 846 P.2d 1124, 1131 (Okl. Cr.1993), cert. denied, —— U.S. ——, 114 S.Ct. 349, 126 L.Ed.2d 313 (1993).

**17.** *Duvall v. State*, 825 P.2d 621, 631 (Okl.Cr. 1991), cert. denied, —— U.S. ——, 113 S.Ct. 224, 121 L.Ed.2d 161 (1992); *Woodruff v. State*, 846 P.2d at 1132.

**18.** *Perkins v. State*, 695 P.2d 1364, 1367 (Okl.Cr. 1985).

**19.** *Duvall*, 825 P.2d at 631; *Ake v. State*, 778 P.2d 460, 466 (Okl.Cr.1989).

**20.** *Morgan v. Illinois*, —— U.S. ——, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992).

sentation of this group in venires is not fair and reasonable in relation to the number of such persons in the community; and (3) that the underrepresentation is due to the systematic exclusion of the group in the jury selection process.[21] Mitchell neither identifies a distinct and underrepresented group nor shows any systematic exclusion of any purported group in the jury selection process. As the record is devoid of evidence to support this claim, the argument must fail.

■ Mitchell also claims a fair cross-section violation because jurors over 70 years old may be excluded from the venire. This Court has addressed and rejected this claim numerous times.[22] Mitchell raises no reason to reconsider these decisions.

■ In proposition six Mitchell claims he was denied a fair and impartial jury when members of Scott's family wore large buttons depicting her absence. Before trial, Mitchell moved to prevent Scott's family from attending the trial wearing large buttons with her photograph, as they had at the preliminary hearing. The trial court asked the prosecutor to explain that no pre-crime photographs of the victim would be allowed in the courtroom. During jury selection, Scott's family removed the photographs and wore blank buttons; the trial court ordered the blank buttons removed, but the prosecutor reported the family refused to remove them. Also during jury selection, defense counsel conveyed the court's admonishment to Mitchell's family, who sat in the gallery holding childhood pictures of Mitchell. At the close of the first day of testimony the trial court kept all families after the jury left, sternly admonished everyone, threatened to remove any spectator who refused to comply with court orders, and raised the specter of contempt

proceedings. The record reflects no further problems.

Although the State claims that prospective jurors had no real information about the case, in fact the venire knew the victim's and defendant's names, the location, charges and nature of the crimes. Sorting out the various courtroom participants would have been relatively easy. However, Mitchell fails to show any prejudice resulting from any of the families' actions. He cites authority[23] concerning photographs of a victim admitted into evidence, which is not at issue here; no pre-crime photo of Scott was ever displayed in the courtroom during the trial. As Mitchell waived five peremptories, he cannot have believed the jury panel was unduly prejudiced by the display, and he neither renewed an objection nor asked for a mistrial when the judge admonished the spectators. Thus, Proposition VI fails.

## ISSUES RELATING TO GUILT AND INNOCENCE

■ In his seventh proposition Mitchell claims the trial court erred in admitting a photograph of Scott taken during the autopsy. The admission of photographs is within the sound discretion of the trial court and will be disturbed on appeal only for an abuse of discretion. Photographs may be admitted if they are relevant and their probative value is not substantially outweighed by their potential for prejudice.[24] State's Exhibit 77, admitted over Mitchell's objection, is a post-autopsy photograph of Scott's face in which her wounds have been cleaned. The photograph does not reflect any autopsy procedure and shows only Mitchell's handiwork. The picture is probative of the nature and extent of the wounds and corroborates the medical examiner's testimony. As Scott was found

**21.** *Duren v. Missouri*, 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979); *Trice v. State*, 853 P.2d 203 (Okl.Cr.1993), cert. denied, —— U.S. ——, 114 S.Ct. 638, 126 L.Ed.2d 597 (1993); *Sellers v. State*, 809 P.2d 676, 782 (Okl.Cr.1991), cert. denied, —— U.S. ——, 112 S.Ct. 310, 116 L.Ed.2d 252 (1991).

**22.** See, e.g., *Brown v. State*, 871 P.2d 56, 63 (Okl.Cr.1994); *Ellis v. State*, 867 P.2d 1289, 1294 (Okl.Cr.1994); *Robedeaux v. State*, 866 P.2d 417, 423 (Okl.Cr.1993); *Trice*, 853 P.2d at 208; *Sell-*

ers, 809 P.2d at 672; *Fox v. State*, 779 P.2d 562, 566 (Okl.Cr.1989), cert. denied, 494 U.S. 1060, 110 S.Ct. 1538, 108 L.Ed.2d 777 (1990).

**23.** *Staggs v. State*, 804 P.2d 456 (Okl.Cr.1991).

**24.** 12 O.S.1991, § 2403; *McCormick v. State*, 845 P.2d 896, 898 (Okl.Cr.1993); *Williamson v. State*, 812 P.2d 384, 400 (Okl.Cr.1991), cert. denied, —— U.S. ——, 112 S.Ct. 1592, 118 L.Ed.2d 308 (1992).

lying face down, this is the only exhibit which shows her facial wounds, and is the only exhibit to show wounds probably made by the golf club, one of the weapons used. The photograph is extremely unpleasant but its probative value clearly outweighs any prejudice to Mitchell. This proposition must fail.

In proposition eight Mitchell claims the trial court erred in permitting Officer Maddox to testify as to his opinion that Mitchell suffered from psychological "disassociation" at the time he made exculpatory statements during his interrogation. On the first videotape Mitchell told a series of stories in which he admitted watching some of the violence at the scene. Officer Maddox told Mitchell he believed Mitchell was experiencing disassociation, relating an experience in which he'd participated as though he'd witnessed it. The two discussed the term. At trial Maddox reiterated the definition of disassociation and explained why he believed Mitchell was disassociating during questioning.

Mitchell now claims that this amounted to a lay person giving a medical diagnosis and was thus improper. This contention is unpersuasive. Even if it had merit, Mitchell did not raise this objection at trial: he objected vigorously on the grounds that Maddox was improperly bolstering the taped statements and asked that he be allowed to present his own witness who could interpret Mitchell's body language on the videotape. When a defendant objects on a specific ground at trial, this Court will not entertain an objection on appeal which differs from the trial objection.[25]

Mitchell's claim in proposition nine fails with the previous argument. Mitchell argues the trial court erred in not allowing him to offer evidence to rebut the testimony of Officer Maddox concerning Mitchell's alleged psychological "disassociation". In the first stage, Mitchell wanted to call a developmental psychologist, Wanda Draper, to interpret his attitude and body language and the inter-

view mechanisms throughout the course of the tapes. During an *ex parte* hearing the trial court correctly told counsel this evidence was inadmissible in the first stage as it would invade the jury's fact-finding province. After Mitchell's testimony concluded, defense counsel made an offer of proof that, if called in the first stage, Draper would testify about Mitchell's developmental history and its effect on his responses. Furthermore, defense counsel expected Draper to explain Mitchell's body language throughout the course of the tapes in order to counter Maddox's observation that Mitchell was lying during the interview. The trial court again determined that Draper's testimony would usurp the jury's role by giving her opinion as to Mitchell's guilt or innocence.

The weight and credibility of witnesses is the exclusive domain of the jury.[26] In the first stage of trial Mitchell wanted Draper, an expert, to interpret and explain Mitchell's actions and motives on the tapes, which is exactly what the jury was required to do in determining the weight and credibility to afford Mitchell's statements. Mitchell argues that the State opened the door for this through Maddox's comments about disassociation and his testimony that he watched Mitchell's body language as one clue that he was lying. As the trial court noted, Maddox was not offering those opinions as expert aids to the jury. Maddox's testimony was not error and Draper's testimony would have infringed on the jury's responsibility. There was no abuse of discretion.

In his tenth proposition Mitchell claims he was denied his Sixth Amendment right of confrontation by the trial court's refusal to permit counsel to impeach the State's forensic witness Joyce Gilchrist. Mitchell did not preserve this issue for appeal. The trial court sustained a pretrial motion in limine in which the State sought to prevent Mitchell from attacking Gilchrist with this Court's opinion in a previous case.[27] During the trial Mitchell neither brought the

25. *Trim v. State,* 808 P.2d 697, 699 (Okl.Cr. 1991).

26. *Curtis v. State,* 762 P.2d 981, 983 (Okl.Cr. 1988).

27. *McCarty v. State,* 765 P.2d 1215 (Okl.Cr.1988) (this Court noted that the Southwestern Association of Forensic Scientists, Inc., censured Gilchrist in 1987 for unethical behavior).

matter up on cross-examination nor made an offer of proof as to the evidence he wished to use. A motion in limine is advisory only and, to preserve the issue for appeal, a party must make an offer of proof, attempt to introduce the disputed matter at trial, or object when the disputed evidence is introduced.[28]

Had the issue been properly preserved, Mitchell's argument would fail because he evidently misunderstood the scope of the trial court's ruling. The trial court prospectively barred Mitchell from impeaching Gilchrist by using the *McCarty* opinion. This Court's published comments concerning another case would appear to be of little or no value in Mitchell's trial. Clearly, the fact that Gilchrist had been censured by a professional organization is highly relevant and exactly the sort of evidence which would be of interest to a jury in determining her credibility. Nothing in the trial court's ruling prevented Mitchell from asking Gilchrist if she had been censured by a professional organization.

In proposition eleven Mitchell claims the trial court erred in not conducting a *Frye*[29] hearing before admitting Brian Wraxall's evidence of the forensic test results from the Serological Research Institute. Again, Mitchell has not preserved this issue. Not only did he fail to object to Wraxall's testimony on *Frye* (or any other) grounds, he never formally requested a *Frye* hearing. At the end of the June 12, 1992 motions hearing Mitchell told the Court he had not filed a motion but would want a *Frye* hearing on

electrophoresis, DNA and HLADQa DNA testing. The record before this Court contains no *Frye* motion. On the first day of trial before jury selection the trial court noted the *Frye* hearing had not yet been held. During the discussion which followed Mitchell conceded that his expert might use the same tests but stated that his expert might not testify. Mitchell indicated he believed a *Frye* hearing would be necessary for the State to meet its burden. The trial court never ruled on the issue and no further mention of it is made in the transcripts. This proposition is without merit.[30]

In his twelfth proposition Mitchell argues the trial court erred in prohibiting him from impeaching Michael Harjochee with questions about his sexual relationship with Scott. Scott had a steady boyfriend, Phillip Taylor, and was also seeing Michael Harjochee, a City worker who knew Mitchell. Both Harjochee and Taylor gave police body samples during the investigation. The trial court prevented Mitchell from cross-examining Harjochee regarding his sexual relationship with Scott, as that testimony was prohibited by the rape shield statute, 12 O.S.1992, § 2412. After Harjochee completed his testimony but before he was excused, Mitchell unsuccessfully asked the trial court to reconsider its ruling, stating that the questions went to witness bias.

It is well settled that an important function of the Sixth Amendment right to confrontation is cross-examination. Wit-

28. *Luna v. State*, 829 P.2d 69, 71 (Okl.Cr.1992). I personally strongly disagree with the holding in *Luna*. This requires counsel to bring issues to the court's attention before trial, obtain a ruling, then interrupt trial proceedings with an objection or offer of proof or evidence solely to preserve a record for appeal. This requirement serves no trial purpose and can only delay a trial's progress. However, until, or unless *Luna* is overruled, it is the law in this state.

29. *Frye v. United States*, 293 F. 1013 (App.D.C. 1923).

30. The proposition would be without merit even were it properly before the Court. *Frye*, the nationwide standard for admissibility of scientific evidence, requires that a party must lay a foundation for the evidence by establishing its under-

lying scientific basis and reliability. The Supreme Court recently determined that the Federal Rules of Evidence support a more relaxed standard which requires a court to determine only whether the expert will testify to specialized knowledge that will assist the trier of fact to understand or determine a fact in issue. *Daubert v. Merrill Dow Pharmaceuticals*, —— U.S. ——, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). This Court has not yet determined whether it will continue to use the *Frye* standard or adopt the *Daubert* ruling. In *Paxton v. State*, 867 P.2d 1309 (Okl.Cr.1993) this Court acknowledged the *Daubert* standard but did not indicate a preference for either test. Other states have admitted DNA testing and the polymerase chain reaction test using the *Frye* standard. See, e.g., *State v. Lyons*, 124 Or.App. 598, 863 P.2d 1303, 1309 (1993).

ness bias is always relevant, impeachment evidence which establishes bias is always relevant, and such evidence, when otherwise appropriate, is admissible.[31] Oklahoma's rape shield statute limits the admissibility of relevant evidence in rape cases. Mitchell offers no persuasive arguments for his claim that the rape shield statute should not apply when the victim is dead. Mitchell claims that Harjochee was called to connect Scott and Mitchell and consent is not at issue,[32] so the rape shield statute should not apply. On the contrary, where consent is not at issue, a defendant should be prohibited from cross-examination regarding the victim's prior sexual relations with others, and such cross-examination is improper when directed to any witness, not just the victim.[33] In addition, the testimony would have been cumulative or of limited relevance at best. Unlike Mitchell, Harjochee was not connected to the crimes by forensic evidence. As Harjochee admitted he was dating Scott the jury had some evidence he might be biased.

▮▮▮▮ In proposition thirteen Mitchell argues the evidence of rape and anal sodomy was insufficient because the state failed to prove the element of penetration. To support a conviction for rape or anal sodomy, the State must prove even slight penetration.[34] This Court will not disturb a verdict where, reviewing the evidence in the light most favorable to the State, a rational trier of fact could find the essential elements of the crime beyond a reasonable doubt.[35] Where a case is based on circumstantial evidence, that evidence must exclude every reasonable hypothesis except that of guilt.[36] This Court will accept all reasonable inferences and credibility choices supporting the jury verdict.[37] The medical examiner found no trauma and no sperm on the vaginal or rectal swabs; neither the FBI nor Wraxall of the Serological Research Institute found sperm on the vaginal or rectal swabs; Joyce Gilchrist found small amounts of sperm on both vaginal and rectal swabs. Mitchell essentially claims that the evidence is insufficient because Gilchrist's findings and testimony cannot be trusted and are not corroborated.[38] This Court cannot distinguish between Gilchrist's veracity and that of other experts. Gilchrist's findings indicated the presence of sperm in the vaginal and anal canals (the latter consistent with Mitchell). Sperm consistent with Mitchell was also found on the medical examiner's transport sheet in the area where Scott's genitals lay during transport. A jury could reasonably infer that even slight penetration was necessary for sperm to be found in both canals, and the evidence was sufficient to support these convictions.

▮▮▮▮ In proposition fourteen Mitchell claims the State failed to prove beyond a reasonable doubt essential elements of the crime of robbery with a dangerous weapon. Mitchell was convicted of robbing Scott of her purse by threatening her with a golf club. To sustain a conviction for robbery with a dangerous weapon, the State must prove another's wrongful taking of one's personal property against one's will, by force or

---

**31.** *Delaware v. Van Arsdall,* 475 U.S. 673, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986); *Beck v. State,* 824 P.2d 385 (Okl.Cr.1991).

**32.** Mitchell consistently denied any sexual assault on Scott and never claimed she consented to any form of intercourse.

**33.** *Hawkes v. State,* 644 P.2d 111, 113 n. 2 (1982); *Teafatiller v. State,* 739 P.2d 1009, 1012 (Okl.Cr.1987).

**34.** 12 O.S.1991, §§ 886, 887, 1113; *Vaughn v. State,* 697 P.2d 963 (Okl.Cr.1985).

**35.** *Spuehler v. State,* 709 P.2d 202, 203–204 (Okl. Cr.1985).

**36.** *Mayes v. State,* 65 O.B.J. 2245, 2250, 1994 WL 282985 (Okl.Cr. June 24, 1994).

**37.** *Maxwell v. State,* 742 P.2d 1165, 1169 (Okl.Cr. 1987).

**38.** Mitchell suggested at trial that semen and body fluids could travel downwards while the body was at rest in order to explain the presence of sperm and indications of seminal fluid on the rectal swab. However, Scott was found lying face down.

fear.[39] In his taped statements Mitchell admitted his intent to rob Scott, searching her purse at the Center and striking her head with a golf club. At trial Mitchell said he declined to participate in a scheme to rob Scott and denied touching her purse or striking her at all, but said that Scott told the other man, C. Ray, to take her purse. No purse was found at the scene, in Scott's car, or at Mitchell's house. No testimony introduced at trial indicated Scott had a purse when she got to the Center. Mitchell's testimony does indicate Scott's purse was there. A confession must be supported by substantial independent evidence which would tend to establish its trustworthiness, and the independent evidence need not establish every element of an offense.[40] Mitchell's statements about robbery and Scott's purse are supported by the absence of a purse at the scene after the crimes. Viewing the evidence in the light most favorable to the State and accepting all inferences and credibility choices which would support the verdict, there is sufficient evidence to support the conviction.

 Mitchell claims in proposition fifteen that the circumstantial evidence was insufficient to support his conviction for larceny of an automobile. To sustain this conviction the State must prove stealing, a felonious taking with intent to permanently deprive the owner of property.[41] Mitchell consistently denied that he drove Scott's car; in the taped statements he variously admits to riding in the car briefly and touching the outside driver's door handle. He said that one of several other people stole the car and that Scott told those other people or himself to take her car. When Biggs, the roofing supervisor, entered the parking lot, he noticed a parked small red car (identified as Scott's), empty, with its engine running. Kibbey saw a black man in a dark red cap drive away from the Center in Scott's car. Andre Wilson saw Mitchell, wearing a dark cap, walking away from Scott's car where it had been abandoned. Viewing the evidence in the light most favorable to the State and accepting all inferences and credibility choices which would support the verdict, there is sufficient evidence to support the conviction.

 In his sixteenth proposition Mitchell argues the trial court erred in refusing his requested instructions on the lesser-included offenses of manslaughter and murder in the second degree. A defendant in a capital case is entitled to instructions on any lesser included non-capital charge supported by the evidence.[42] Mitchell requested instructions on first degree manslaughter and second degree murder. He argues in support of both that the jury could have believed his trial testimony that he looked on as C. Ray killed Scott, that the evidence might have supported either a lack of intent to kill or no design to effect death on C. Ray's part, and that Mitchell can take advantage of that as an aider and abettor. This Court has held that where a defendant claims he is innocent and another committed the crime, the defendant is not entitled to instructions on lesser included offenses.[43] When a defendant's testimony excludes all but one theory of defense, he is deemed to have elected that

**39.** 21 O.S.1991, § 791, 801; *Carter v. State,* 725 P.2d 873 (Okl.Cr.1986).

**40.** *Fontenot v. State,* 881 P.2d 69, 78 (Okl.Cr. 1994).

**41.** 21 O.S.1983, § 1720; *Johnson v. State,* 451 P.2d 391 (Okl.Cr.1969).

**42.** *Beck v. Alabama,* 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980); *Hunter v. State,* 829 P.2d 64 (Okl.Cr.1992).

**43.** *Smith v. State,* 727 P.2d 1366, 1371 (Okl.Cr. 1986), cert. denied, 483 U.S. 1033, 107 S.Ct. 3277, 97 L.Ed.2d 780 (1987); *Wiley v. State,* 551 P.2d 1146, 1150 (Okl.Cr.1976). The wounds here were extensive and severe; several of them could have caused death. The nature and extent of wounds plus the surrounding circumstances have precluded instructions based on lack of intent or lack of design to effect death. *Smith v. State,* 737 P.2d 1206, 1210 (Okl.Cr.1987), cert. denied, 484 U.S. 959, 108 S.Ct. 358, 98 L.Ed.2d 383 (1987) (brutal beating with blunt object); *Camron v. State,* 829 P.2d 47 (Okl.Cr.1992) (beating with shotgun).

theory.[44] Mitchell testified that he had nothing to do with any violence directed at Scott, but watched as C. Ray beat and killed her. Mitchell cannot use the "aider and abetter" theory to benefit from lesser included instructions that would apply to actions he says he did not commit.

■ Mitchell claims in proposition seventeen that the trial court erred in refusing to give the jury a cautionary instruction on informant testimony. Mitchell requested that a cautionary informant instruction be given regarding Andre Wilson's testimony[45]. As Wilson does not appear to have acted as an informant in this case the requested instruction would have been inappropriate. Although Wilson was incarcerated at the time of trial, he was not a jailhouse informer; he was questioned by the police shortly after the murder because his fingerprints were found on Scott's car. He admitted on the stand that he took a pair of women's gloves from Scott's unlocked car, saying "That's auto burglary right there." Mitchell makes much of the fact that Wilson was not prosecuted for auto burglary in connection with this case. Trial testimony clearly indicates that Wilson had no deal with the prosecution, had no idea why he wasn't prosecuted for auto burglary and received no benefit on his current sentence in exchange for his testimony. Nothing in the record suggests Wilson was promised or expected to receive any benefit when he originally spoke to police. Wilson was not working for police or in any way involved in the investigation. Oklahoma cases regarding informers deal with persons who work as undercover agents, work with or for police, expect to be paid for their information, expect a reduced sentence or charge for their testimony, or expect some other benefit as a result of their involvement. None of these elements are present in this case.

## PROSECUTORIAL MISCONDUCT

■ In his eighteenth proposition Mitchell contends that the State engaged in repeated prosecutorial misconduct in the arguments to the jury. Mitchell failed to object to any of the State's closing arguments at trial, and thus waives review of all but plain error.[46] Review of the State's comments reveals no error which denied Mitchell a constitutional or statutory right or went to the case's foundation.[47]

Mitchell initially claims that during first stage closing argument the State told the jury that Mitchell tried to "think up a story". While in some circumstances this might be error, the jury could have easily inferred from the evidence of the tapes and Mitchell's testimony about his former lies that he was trying to create any stories he could. Prosecutors may comment on and draw reasonable inferences and deductions from the evidence.[48]

■ The State commented that Mitchell could have (1) subpoenaed Officer Mullenix to substantiate his claims of threats, (2) subpoenaed his own blood spatter experts, and (3) independently analyzed the forensic evidence. Mitchell appears to claim the comments either impermissibly address his failure to call witnesses or insinuate that he did not call the witnesses because they would have been damaging. A prosecutor may legitimately comment on a defendant's failure to either call a material witness or account

---

44. *Smith,* 727 P.2d at 1371.

45. Wilson put Mitchell, wearing a dark cap, near Scott's abandoned car shortly after the crime.

46. *Trice v. State,* 853 P.2d 203, 214 (Okl.Cr. 1993), cert. denied, —— U.S. ——, 114 S.Ct. 638, 126 L.Ed.2d 597 (1993); *Garcia v. State,* 734 P.2d 820, 824 (Okl.Cr.1987).

47. *Fontenot,* 881 P.2d at 85; 20 O.S.1991, § 3001.1.

48. *Allen v. State,* 871 P.2d 79, 96 (Okl.Cr.1994); *Trice,* 853 P.2d at 214; *Romano v. State,* 847 P.2d 368, 380 (Okl.Cr.1993), cert. granted, —— U.S. ——, 114 S.Ct. 380, 126 L.Ed.2d 330 (1993), aff'd *Romano v. Oklahoma,* —— U.S. ——, 114 S.Ct. 2004, 129 L.Ed.2d 1 (1994).

for his absence.[49] Comment on a defendant's access to evidence and witnesses is permissible.[50] These comments noted Mitchell's ability to call witnesses without drawing any conclusions for the jury. In addition, the prosecutor prefaced the comments by saying that the burden of proof was always on the State.

■ In both first stage closings the State said that Gilchrist and Wraxall of the Serological Research Institute had the same sperm findings from Scott's vaginal swab. This was incorrect. However, every misstatement of fact does not amount to impermissible argument.[51] Mitchell has not shown, and the record does not reflect, that this statement was purposely made in bad faith to mislead or prejudice the jury and Mitchell has not shown any actual prejudice, given the evidence linking him to the crime.[52] The jury was instructed that what attorneys said was not evidence, and the evidence presented by the witnesses was clear and understandable.

■ In second stage closing, the prosecutor argued against imposition of life without parole by saying: "To lock the defendant up forever will not take from the defendant his family.... his friends, television, movies, three square meals a day." The State asked if the jury would let Mitchell "sit in a cell with three meals a day, color TV set and live out the rest of his life". The State also said if given life without parole Mitchell would "go down and sit on that bunk and laugh because he has won ..." The last comment strongly resembles the error in *McCarty*, where the prosecutor wondered if the defendant was "grinning and laughing" when he killed his

victim. We do not condone such argument. However, the comments are not so improper, in light of the evidence presented, as to have affected the jury verdict.[53]

The prosecutor reminded the jury of Scott's mother's description of her little brother's prayers to God to bring his sister back. This statement was initially admitted as victim-impact testimony from Scott's mother and is a proper subject for argument.

■ Both prosecutors talked about the demands of justice in this case, and one quoted Mitchell's taped statement that whoever committed this crime deserved the death penalty. Prosecutors should not express a personal opinion or hold a jury to their personal standards of justice. However, these comments were not phrased in personal terms, but appealed to the jury's understanding of justice and asked that standard be upheld. One comment, that some crimes are so horrible you just have to say "[W]e're not going to take it anymore", tests the bounds of permissible argument, but cannot itself be said to have influenced the verdict, given the evidence against Mitchell.

Mitchell claims the prosecutors impermissibly argued that he lacked remorse, and that this was exacerbated by the State's success at keeping evidence of remorse out of the trial. Mitchell consistently denied harming Scott, but testified that he felt very bad because he wished he could have helped her, that he still had nightmares, and still heard her screams. The record indicates Mitchell became emotional during this testimony. He attempted to use conversations with third parties to bring in evidence of remorse. The

---

**49.** *Trice,* 853 P.2d at 214.

**50.** *Thomas v. State,* 811 P.2d 1337, 1344 (Okl.Cr. 1991), cert. denied, — U.S. —, 112 S.Ct. 895, 116 L.Ed.2d 798 (1992).

**51.** In closing, Mitchell's counsel told the jury he had received serological evidence the day trial began but had been too busy to test it. In an ex

parte record made after arguments the trial court confirmed that counsel had in fact had the evidence analyzed but had chosen not to use the results in his case.

**52.** *Crawford v. State,* 840 P.2d 627, 641 (Okl.Cr. 1992).

**53.** *Duvall,* 825 P.2d at 628.

trial court refused to allow it, holding that evidence of remorse was irrelevant as Mitchell denied committing the crimes (the court noted Mitchell's evidence that he was upset and haunted by Scott's screams).

The State then argued in closing that Mitchell cried crocodile tears and referred to his nightmares and the screams. Moreover, the State claimed Mitchell did not express remorse on the tapes or at trial and cried only because he was scared. This does not amount to telling the jury to punish Mitchell for his trial conduct rather than the crimes charged. Mitchell's testimony brings his manner and attitude before the jury as evidence and therefore a legitimate subject for comment.[54] However, the State should not have argued remorse itself as the court had already found it was not relevant to the trial. In light of the evidence presented this argument alone cannot be said to have influenced the jury verdict.

## ISSUES RELATING TO PUNISHMENT

In his nineteenth proposition Mitchell argues that Oklahoma's death penalty scheme violates the Oklahoma Constitution. Oklahoma's death penalty statutes require that (1) a list of statutory aggravators accompany the jury's general verdict of death, (2) the jury find the aggravators unanimously beyond a reasonable doubt, and (3) the jury make specific findings of fact on particular questions of fact when determining the existence of each aggravator. 21 O.S.1991, § 701.11. Mitchell claims this statutory provision conflicts with Article 7, § 15, of the Oklahoma Constitution, which requires general jury verdicts and prohibits any law from requiring a trial court to direct a jury to

make findings of particular questions of fact. This Court recently addressed this question and determined that Article 7, § 15 went to the determination of guilt or innocence, while § 701.11 directs to the jury regarding the procedures to be used when determining punishment.[55] Mitchell offers no argument to persuade the Court to revisit this issue.

In proposition twenty Mitchell claims he was denied his constitutional right to present evidence in mitigation of punishment when the trial court refused to allow testimony concerning the cost-effectiveness of the death penalty. A capital case defendant may submit in mitigation any aspect of his character and record and any circumstances of the offense he wishes to proffer as a basis for a noncapital sentence.[56] Mitchell wished to present evidence of the cost-effectiveness of the death penalty to American society—a moral/economic argument. While this evidence may well have been helpful to some jurors, it is relevant neither to the offenses nor to any aspect of Mitchell himself. This Court declines Mitchell's invitation to extend the requirements above to include this material.

In proposition twenty-one Mitchell argues that admission of victim-impact evidence violated the constitutional prohibition against the ex post facto application of criminal statutes. These offenses were committed January 7, 1991, and the trial was held June 15–26, 1992. On April 18, 1992, legislation was adopted that allowed victim-impact evidence to be presented during the second stage of capital cases.[57] Mitchell claims the admission of victim-impact evidence constitutes an ex post facto law as the law altered legal rules of evidence to receive different testimony than would have been admissible at the

---

**54.** *Smith v. State,* 727 P.2d at 1374.

**55.** *Romano v. State,* 847 P.2d 368, 384–385 (Okl. Cr.1993), cert. granted, —— U.S. ——, 114 S.Ct. 380, 126 L.Ed.2d 330 (1993), aff'd *Romano v. Oklahoma,* —— U.S. ——, 114 S.Ct. 2004, 129 L.Ed.2d 1 (1994).

**56.** *Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978); *Eddings v. Oklahoma,*

455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982); *Skipper v. South Carolina,* 476 U.S. 1, 106 S.Ct. 1669, 90 L.Ed.2d 1 (1986); *Chaney v. State,* 612 P.2d 269 (Okl.Cr.1980), cert. denied, 450 U.S. 1025, 101 S.Ct. 1731, 68 L.Ed.2d 219 (1981).

**57.** 21 O.S.Supp.1992, § 701.10(C).

time of his offenses. He alleges the testimony disadvantaged him.

■ Article I of the United States Constitution provides that neither Congress nor any State shall pass any "ex post facto Law." [58] An ex post facto law is:

"1st. Every law that makes an action done before the passing of the law, and which was innocent when done, criminal; and punishes such action. 2d. Every law that aggravates a crime, or makes it greater than it was, when committed. 3d. Every law that changes the punishment, and inflicts a greater punishment, than the law annexed to the crime, when committed. 4th. Every law that alters the legal rules of evidence, and receives less, or different testimony, than the law required at the time of the commission of the offense, in order to convict the offender." [59]

A defendant must show that a law is retrospective and he has been disadvantaged by it.[60] The law in question must alter substantial personal rights; a law is not ex post facto if it merely changes modes of procedure.[61]

■ This Court has held that the life without parole sentencing option is procedural when applied to defendants whose crimes were committed before the option was available, but who were tried after it was enacted.[62] These cases were decided under the third prong of the ex post facto test above, which refers to a change in punishment. Mitchell's claim lies under the fourth prong, a substantive change in admissible testimony. In recent dicta the Supreme Court has noted that the fourth criterion above does not appear to prohibit the application of new evidentiary rules in trials for crimes committed before evidentiary changes.[63] Legislative and judicial consistency demands that as the change in Oklahoma's capital sentencing scheme including the life without parole sentencing option is procedural, legislative changes in admissible testimony during the second stage of a capital trial are procedural as well. Moreover, it should be noted that the victim impact testimony was not used to "convict the offender", but rather was used in the sentencing procedure after Mitchell's conviction.

In proposition twenty-two Mitchell argues that he was harmed by the admission of victim-impact evidence, coupled with the denial of Mitchell's request to personally address his sentencing jury. The legislature's enactment of 21 O.S.Supp.1992, § 701.10(C) was in response to the Supreme Court decision in *Payne v. Tennessee,*[64] which held that the Constitution does not prohibit victim-impact evidence if states wish to allow it. Mitchell appears to claim here that this evidence was improperly admitted and prejudicial. He also claims he was improperly denied the right to personally address the jury, and was fatally prejudiced by the combination of these errors.

■ The trial court limited the victim-impact evidence to matters contained in the State's Notice of Intent to Produce Victim Impact Evidence. The jury heard about Scott's University of Oklahoma studies and work with and love of disadvantaged children and some specific reactions of her family to her death. Victim-impact evidence should be

**58.** See Art. I, Sec. 9, cl. 3; Art. I, Sec. 10, cl. 1.

**59.** *Miller v. Florida,* 482 U.S. 423, 107 S.Ct. 2446, 96 L.Ed.2d 351 (1987), citing *Calder v. Bull,* 3 U.S. (3 Dall.) 386, 1 L.Ed. 648 (1798).

**60.** *Miller v. Florida,* supra.

**61.** *Miller,* supra; *Salazar v. State,* 852 P.2d 729, 737 (Okl.Cr.1993); *Allen v. State,* 821 P.2d 371, 375 (Okl.Cr.1991).

**62.** *Fontenot v. State,* 881 P.2d 69 n. 2 (Okl.Cr. 1994); *Humphrey v. State,* 864 P.2d 343, 344 (Okl.Cr.1993); *Salazar,* 852 P.2d at 737–741; *Hain v. State,* 852 P.2d 744, 753 (Okl.Cr.1993); *Wade v. State,* 825 P.2d 1357, 1363 (Okl.Cr. 1992); *Allen,* 821 P.2d at 375.

**63.** *Collins v. Youngblood,* 497 U.S. 37, 43 n. 3, 110 S.Ct. 2715, 2719 n. 3, 111 L.Ed.2d 30 (1990).

**64.** 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991).

independently weighed before admission like any other evidence to ensure it is more probative than prejudicial.[65] The record does not support Mitchell's claim that no balancing test was conducted before Scott's mother and father testified. There was no evidentiary hearing, no proffer of testimony (nor did Mitchell request this), no trial court review of each specific point of testimony, but all parties were clearly aware of the nature of the testimony that would be presented. The trial court also made clear that if the family proved uncontrollable he would not allow any victim-impact testimony. The record reflects the trial court's awareness of the potential for prejudice and danger of improper influence of the jury inherent in this testimony.

Mitchell's motion for allocution was first discussed during the January 10, 1992 motions hearing; at that time the trial court reserved its ruling and asked Mitchell to provide suggested guidelines for his requested speech. The trial court overruled the motion for allocution during the motions hearing of June 12, 1992, and Mitchell did not raise the matter again. He was given an opportunity to speak at the sentencing hearing but declined.

A motion for allocution traditionally provides a defendant the chance to address the sentencing body in a personal plea for mercy. The Supreme Court has discussed allocution but has never held that a criminal defendant has a constitutional right to allocution such that if he requests allocution he must be allowed to speak. Mitchell concedes that allocution is usually held appropriate at the sentencing hearing rather than second stage argument. However, he argues that under Oklahoma law a trial court must follow the jury sentencing recommendation, so any ar-

gument to the sentencing court would be pointless.[66] We find this argument unpersuasive. Mitchell also claims his due process liberty interest in a jury sentencing requires that he be allowed to address the second stage jury.[67] We have recently held that a request for allocution is satisfied where a defendant is given the opportunity to address the court at formal sentencing.[68]

■ In his twenty-third proposition Mitchell claims Instruction 16 improperly engendered sympathy for Scott while denying Mitchell's right to full and fair consideration of his mitigating evidence. In the first stage the jury was instructed not to let sympathy enter into their deliberations. Second stage Instruction 16 reads in part:

> "[U]nlike what you were instructed in the first stage of this trial, you may, in your discretion, consider sympathy as a factor in your deliberations and then determine whether or not you should give any weight to such factor under all the evidence you have heard in both the first and second stages."

Mitchell did not object to this instruction at trial, and thus has waived all but plain error.[69] He had unsuccessfully requested an instruction allowing the jury to consider sympathy for Mitchell only. Mitchell claims that the instruction given allows the jury to consider sympathy for both Mitchell and Scott, and argues that this is impermissible. Instruction 16 named neither Scott nor Mitchell, but allowed the jury to consider "sympathy" generally. Mitchell's claim that this somehow precluded the jury from regarding him with sympathy is inexplicable. This Court has recently considered this issue and determined that this instruction comports with the legislature's intent in allowing victim impact evidence to be presented to the jury.[70]

**65.** 12 O.S.1991, § 2403.

**66.** 22 O.S.1991, § 926.

**67.** *Hicks v. Oklahoma,* 447 U.S. 343, 100 S.Ct. 2227, 65 L.Ed.2d 175 (1980).

**68.** *Freeman v. State,* 876 P.2d 283, 289–290 (Okl. Cr.1994). We neither address nor decide the

issue of a defendant's request to speak to the jury before sentencing under 21 O.S.1991 § 701.10(D).

**69.** *Ashinsky v. State,* 780 P.2d 201, 206 (Okl.Cr. 1989).

**70.** *Freeman v. State,* 876 P.2d at 289.

■ In his twenty-fourth proposition Mitchell argues that the trial court erred in failing to inform the jury that its findings regarding mitigating circumstances did not have to be unanimous. Instruction 9 told the jury:

"You need not agree unanimously on the existence of any mitigating circumstance or circumstances."

Mitchell thus erroneously claims that the jury was never told a finding of specific mitigating circumstances need not be unanimous, and that jurors were not told they could consider all mitigators whether there was unanimous agreement as to their existence. Oklahoma law does not require a unanimous finding of mitigating circumstances, which would be unconstitutional.[71] This Court has consistently rejected this argument.[72]

■ Mitchell argues in proposition twenty-five that the trial court's instructions set forth an improper burden of proof regarding the manner in which the jury was to weigh aggravating factors against mitigating cir-cumstances. Mitchell unsuccessfully requested an instruction that required aggravating circumstances to outweigh mitigating circumstances beyond a reasonable doubt. Specific standards for balancing aggravating and mitigating circumstances are not constitutionally required.[73] Whether aggravators outweigh mitigating circumstances is left to the jury's discretion.[74] This Court has consistently rejected this argument.[75]

■ In his twenty-sixth proposition Mitchell argues the trial court erred in failing to instruct the jury that it had the option to return a life sentence regardless of its findings respecting aggravating and mitigating circumstances. A life sentence may be given notwithstanding a jury finding of aggravating circumstances which outweigh mitigating circumstances, but an instruction on this point is not required.[76] Mitchell requested such an instruction. The jury instructions accurately stated the law and the failure to give requested Instruction 9 was not error.[77] This Court has consistently re-

---

**71.** See *McKoy v. North Carolina*, 494 U.S. 433, 438–42, 110 S.Ct. 1227, 1231–32, 108 L.Ed.2d 369 (1990).

**72.** *Pickens v. State*, 850 P.2d at 339–40; *Woodruff v. State*, 846 P.2d at 1148–49; *Castro v. State*, 844 P.2d 159, 176 (Okl.Cr.1992), cert. denied, —— U.S. ——, 114 S.Ct. 135, 126 L.Ed.2d 98 (1993); *Clayton v. State*, 840 P.2d 18, 34 (Okl.Cr.1992), cert. denied, —— U.S. ——, 113 S.Ct. 1655, 123 L.Ed.2d 275 (1993).

Mitchell argues that this instruction was wedged into the instructions for aggravating circumstances, all of which required unanimity. The record reveals that Instructions 1–6 do not touch on unanimity requirements; Instruction 7 defines aggravating circumstances and requires unanimity; Instruction 8 defines mitigating circumstances and does not discuss unanimity; Instruction 9 lists specific mitigating circumstances and reads as above; and Instruction 10 requires the jury to unanimously find at least one aggravator then unanimously find that it outweighs any mitigator before imposing the death penalty; Instruction 11 requires jurors to unanimously find an aggravator and reduce that finding to writing, but does not require written or unani-mous findings of any mitigators. The distinctions between aggravating factors and mitigating circumstances are clear and unambiguous.

**73.** *Zant v. Stephens*, 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983).

**74.** *Johnson v. State*, 731 P.2d 993, 1004 (Okl.Cr. 1987), cert. denied, 484 U.S. 878, 108 S.Ct. 35, 98 L.Ed.2d 167 (1987).

**75.** See, e.g., *Malone v. State*, 876 P.2d 707, 715 (Okl.Cr.1994); *Revilla v. State*, 877 P.2d 1143, 1153 (Okl.Cr.1994); *Ellis*, 867 P.2d at 1301; *Trice*, 853 P.2d at 216; *Woodruff*, 846 P.2d at 1149.

**76.** *Parks v. State*, 651 P.2d 686 (Okl.Cr.1982), cert. denied, 459 U.S. 1155, 103 S.Ct. 800, 74 L.Ed.2d 1003 (1983).

**77.** Instruction 2 told the jury they must impose a noncapital sentence if they had a reasonable doubt about Mitchell's guilt as to the Bill of Particulars. Instruction 7 authorized the jury to consider imposing the death penalty upon a unanimous finding of one or more aggravating circumstances beyond a reasonable doubt.

jected this argument.[78]

■ Mitchell argues in proposition twenty-seven that the jury instructions regarding mitigation permitted the jurors to ignore mitigating evidence altogether. Instruction 8 told the jury mitigating circumstances are those which "may be" considered as extenuating or reducing the degree of moral culpability or blame. Mitchell complains that the "may be" language allowed the jury to ignore both circumstances listed in Instruction 9 and any other circumstances they might otherwise have found from the evidence. On the contrary, "may be" reflects the correct constitutional standard; any mandatory language would infringe on the jury's duty to determine individual punishment. This Court has consistently rejected this argument.[79]

■ In proposition twenty-eight Mitchell claims that the instruction regarding the weighing of aggravating and mitigating circumstances was contrary to the dictates of 21 O.S.1991, § 701.11. Instruction 10 read:

If you unanimously find that one or more of the aggravating circumstances existed beyond a reasonable doubt, unless you also unanimously find that any such aggravating circumstance or circumstances outweigh the finding of one or more mitigating circumstances, the death penalty shall not be imposed. (OUJI–CR 440)

Title 21 O.S.1991, § 701.11 does not allow the death penalty to be imposed unless there is a unanimous finding of at least one statutory aggravating circumstance beyond a reasonable doubt, or any such aggravating circumstance is outweighed by the finding of one or more mitigating circumstances.

Mitchell claims that Instruction 10 above did not comport with this Court's approved instruction set forth in *Davis v. State:*[80]

If you do unanimously find one or more of these aggravating circumstances existed beyond a reasonable doubt and you further find that such aggravating circumstance or circumstances is outweighed by the finding of one or more mitigating circumstances the death penalty shall not be imposed. In that event the sentence would be imprisonment for life.

The trial court gave the standard OUJI instruction, which makes clear the requirement that aggravating circumstances must outweigh mitigators unanimously. This is not contrary to § 701.11 nor diminishes or skews the burden of proof. This Court has previously rejected this argument.[81]

■ Mitchell argues in proposition twenty-nine that the trial court erred in failing to instruct Mitchell's jury on the presumption of life. Mitchell unsuccessfully requested such an instruction. Instruction 2 told the jury Mitchell was presumed innocent of the charges made in the Bill of Particulars, and that if they had any doubt as to his guilt they should return a noncapital sentence. Later instructions correctly set forth the burden of proof and the standards and procedures for weighing aggravating and mitigating evidence. Mitchell is not entitled to an instruction on presumption of life. This court has consistently rejected this argument.[82]

**78.** See, e.g., *Malone v. State*, 876 P.2d at 714–715 (Okl.Cr.1994); *Allen v. State*, 871 P.2d at 102; *Brown v. State*, 871 P.2d at 73; *Robedeaux v. State*, 866 P.2d at 435; *Pickens*, 850 P.2d at 339; *Fisher v. State*, 845 P.2d 1272, 1278 (Okl.Cr. 1992), cert. denied —— U.S. ——, 113 S.Ct. 3014, 125 L.Ed.2d 704 (1993).

**79.** *Pickens*, 850 P.2d at 339–340; *Revilla*, 877 P.2d at 1153–54; *Brown v. State*, 871 P.2d at 74; *Williamson v. State*, 812 P.2d 384, 400 (Okl.Cr. 1991), cert. denied, —— U.S. ——, 112 S.Ct. 1592, 118 L.Ed.2d 308 (1992).

**80.** 665 P.2d 1186 (Okl.Cr.1982) cert. denied, 464 U.S. 865, 104 S.Ct. 203, 78 L.Ed.2d 177 (1983),

modified *Davis v. Maynard*, 869 F.2d 1401 (10th Cir.1989), cert. granted and judgment vacated *Saffle v. Davis*, 494 U.S. 1050, 110 S.Ct. 1516, 108 L.Ed.2d 756 (1990), on remand *Davis v. Maynard*, 911 F.2d 415 (10th Cir.1990).

**81.** *Allen v. State*, 871 P.2d at 101.

**82.** *Malone*, 876 P.2d at 713; *Allen*, 871 P.2d at 103; *Brown*, 871 P.2d at 73; *Trice*, 853 P.2d at 215; *Johnson v. State*, 731 P.2d 993, 1004 (Okl. Cr.1987), cert. denied, 484 U.S. 878, 108 S.Ct. 35, 98 L.Ed.2d 167 (1988); *Walker v. State*, 723 P.2d 273, 284 (Okl.Cr.1986), cert. denied 479 U.S. 995, 107 S.Ct. 599, 93 L.Ed.2d 600 (1987).

■ Mitchell argues in proposition thirty that Oklahoma's "continuing threat" aggravating circumstance continues to be applied and interpreted in an unconstitutionally vague and overbroad manner. This Court has held continuing threat may be proved by prior convictions, unadjudicated crimes, or the circumstances of the crime for which the defendant is on trial. This Court recently found insufficient evidence of this aggravator where no evidence was presented to support the claim,[83] and has consistently rejected Mitchell's argument.[84]

More particularly, the evidence supporting the continuing threat aggravator against Mitchell included the testimony of his juvenile rape victim, who testified he threatened to kill her, and his own admissions to prior juvenile crimes.

■ In proposition thirty-one Mitchell argues that the aggravating circumstance that "the murder was committed for the purpose of avoiding arrest or prosecution" is being applied and interpreted in an unconstitutionally vague and overbroad manner. Mitchell argues that this aggravator is standardless. On the contrary, before it can apply there must be a predicate crime separate from the murder for which a defendant seeks to avoid arrest.[85] This aggravating circumstance requires a determination of the state of mind of the defendant, which may be inferred from circumstantial evidence.[86] Here, Mitchell was also convicted of rape and anal sodomy. His previous victim testified that, after he raped her, he said if she told anyone he would kill her. Especially in light of the ensuing circumstances (she reported the rape

and he was incarcerated for three years) the inference that he killed Scott to prevent her reporting the rape could be made.

■ In proposition thirty-two Mitchell attacks the aggravating circumstance of "heinous, atrocious or cruel", claiming the jury instruction did not adequately channel the jury's discretion. Instruction 6 read:

As used in these instructions, the term "heinous" means extremely wicked or shockingly evil; "atrocious" means outrageously wicked and vile; "cruel" means pitiless, or designed to inflict a high degree of pain, utter indifference to, or enjoyment of, the sufferings of others.

The phrase "especially heinous, atrocious, or cruel" is directed to those crimes where the death of the victim was preceded by conscious physical suffering caused by torture of the victim or serious physical abuse.

Mitchell claims that this instruction differs from the standard OUJI instruction and fails to channel the jury's discretion. It is difficult to ascertain the precise basis for Mitchell's complaint. One can only hope it is not, as the State suggests, the phrase "conscious physical suffering", which was added, evidently at Mitchell's request and certainly with his assent, after he objected to the initial OUJI instruction. This Court has consistently upheld the heinous, atrocious or cruel aggravator when limited by instruction to cases involving torture or serious physical abuse.[87]

In proposition thirty-three Mitchell claims that, if an aggravating circumstance relied

---

**83.** *Malone,* 876 P.2d at 717.

**84.** See, e.g., *Hogan v. State,* 877 P.2d 1157, 1162 (Okl.Cr.1994); *Snow v. State,* 876 P.2d 291, 298 (Okl.Cr.1994); *Revilla,* 877 P.2d at 1153; *Brown,* 871 P.2d at 73; *Ellis,* 867 P.2d at 1301; *Paxton,* 867 P.2d at 1325; *Trice,* 853 P.2d at 220–221; *Pickens,* 850 P.2d at 339.

**85.** *Barnett v. State,* 853 P.2d 226, 233 (Okl.Cr. 1993).

**86.** *Rojem v. State,* 753 P.2d 359, 368 (Okl.Cr. 1988).

**87.** See, e.g., *Stouffer v. State,* 742 P.2d 562, 563 (Okl.Cr.1987) (Opinion on Rehearing), cert. denied 484 U.S. 1036, 108 S.Ct. 763, 98 L.Ed.2d 779 (1988); *Hooks v. State,* 862 P.2d 1273, 1282 (Okl.Cr.1993); *Clayton v. State,* 840 P.2d at 31; *Stafford v. State,* 832 P.2d 20, 23 (Okl.Cr.1992); *Rojem v. State,* 753 P.2d at 369.

upon by Mitchell's jury in imposing a sentence of death is invalidated, this Court must afford Mitchell notice and a right to be heard on the validity of the "continuing threat" aggravating circumstance at the time of sentencing before engaging in a reweighing process. Mitchell does not contest this Court's ability to reweigh his sentence, but argues that, before any reweighing can validly find continuing threat as an aggravating circumstance, he should have a chance to show his adjustment to incarceration on the issue of future dangerousness to society. As there is no need to engage in the reweighing process, this argument is moot.

In proposition thirty-four Mitchell argues that, as his death sentence was imposed pursuant to a balancing scheme that relied solely upon unconstitutional aggravating circumstances in a state which affords a due process right to jury sentencing, his death sentence must be vacated. Mitchell argues that although this Court can reweigh sentences in capital cases, it cannot impose sentences; that, in fact, this Court is powerless to reweigh aggravators because the jury does not make written findings of mitigating factors, so this Court cannot determine what the jury considered; and that any reweighing would be a sentencing de novo, thus depriving Mitchell of his right to a jury sentence. As the aggravating circumstances found by the jury are constitutional, we do not reach this claim.

## MANDATORY SENTENCE REVIEW

In accordance with 21 O.S.Supp. 1985, § 701.13(C), we must determine (1) whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor, and (2) whether the evidence supports the jury's finding of aggravating circumstances.

Upon review of the record, we cannot say the sentence of death was imposed because the jury was influenced by passion, prejudice, or any other arbitrary factor contrary to 21 O.S.Supp.1987, § 701.13(C).

The jury was instructed on and found the existence of three aggravating circumstances: (1) the murder was especially heinous, atrocious, or cruel; (2) the murder was committed for the purpose of avoiding or preventing a lawful arrest or prosecution; and (3) there was a probability that Mitchell would commit criminal acts of violence that would constitute a continuing threat to society. Upon our review of the record, we find the sentence of death to be factually substantiated and appropriate.

Finding no error warranting modification, the Judgments and Sentences of the District Court of Oklahoma County are **AFFIRMED.**

LUMPKIN, P.J., JOHNSON, V.P.J., LANE and STRUBHAR, JJ., concur.