[No. S087243. July 12, 2004.]

THE PEOPLE, Plaintiff and Respondent, v.
JOHN GEORGE BROWN, JR., Defendant and Appellant.

**COUNSEL**

Marilee Marshall, under appointment by the Supreme Court, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, William W. Wood and Robert M. Foster, Deputy Attorneys General, for Plaintiff and Respondent.

---

**OPINION**

**BROWN, J.**—A jury convicted defendant John George Brown, Jr., of first degree murder, found true the special circumstance allegation of intentionally killing a peace officer engaged in the performance of his duties, and returned a verdict of death. On automatic appeal, this court affirmed the judgment in its entirety. (*People v. Brown* (1988) 46 Cal.3d 432 [250 Cal.Rptr. 604, 758 P.2d 1135] (*Brown I*).) On petition for writ of habeas corpus, however, we found *Brady* error (*Brady v. Maryland* (1963) 373 U.S. 83 [10 L.Ed.2d 215, 83 S.Ct. 1194]) in the prosecution's failure to disclose that the result of a radioactive immunoassay of a blood sample taken from defendant shortly after the crimes was positive for phencyclidine. (*In re Brown* (1998) 17 Cal.4th 873 [72 Cal.Rptr.2d 698, 952 P.2d 715].)

On retrial, a jury again convicted defendant of first degree murder and found true the special circumstance allegation. (See Pen. Code, § 190.2, subd. (a)(7); all undesignated statutory references are to the Penal Code.)[1] The second jury also returned a death verdict. This appeal is automatic. (Cal. Const., art. VI, § 11; Pen. Code, § 1239.) We find no reversible error and affirm the judgment in its entirety.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. *Guilt Phase Evidence*

Since the prosecution's case-in-chief on retrial substantially replicated the evidence presented at the original trial, we draw in part on our factual statement in *Brown I*.

"In June 1980 defendant was a wanted man; he had failed to appear for a jury trial and another criminal hearing, and two bench warrants were issued

---

[1] In addition, the jury found defendant guilty of three counts of assault with intent to commit murder (§ 217) and one count of assault on a peace officer (§ 245, subd. (b)). It found true allegations that as to all crimes he personally used a firearm (§ 12022.5) and that as to one of the assaults he inflicted great bodily injury (§ 12022.7).

for his arrest. After telling his former live-in girlfriend he was not going back to jail and did not want to die in prison, defendant bought a gun and changed his name to Gordon Mink. [¶] Meanwhile the Garden Grove police were looking for him." (*Brown I, supra*, 46 Cal.3d at p. 440.)

About 11:00 o'clock on the evening of June 7, Officer Paul McInerny and his partner, Reserve Officer Dwight Henninger, saw defendant's car in the parking lot of the Cripple Creek Bar. In response to their radio call for assistance, Officers Donald Reed and Glenn Overly arrived a few minutes later. "After discussing [the situation], all four officers—all in full uniform—entered the crowded bar through two separate doors and worked their way to the center of the room. [¶] Defendant, who was sitting in the corner with a group of other '. . . people,' saw the officers enter; a nearby patron heard him say 'the pigs are here,' as he started for the door. The officers recognized defendant and moved in his direction. At the door, Officer Reed caught up with defendant and put his hand on defendant's shoulder. Before any of the officers could draw his weapon, defendant pulled a gun and fired at least eight times. Two lethal shots hit Officer Reed; three shots gravely wounded Officer Overly; Officer Henninger was seriously wounded; a private citizen, Terezia, suffered permanent and grave injury after being shot between the eyes; and another citizen, McKinney, was shot in the leg.

"Defendant fled and hid in some bushes outside the bar. About two hours later, with numerous officers at the scene, he was found crouched in the dirt. As he was brought out of the bushes an officer called out, 'Where's the gun?' Defendant stated, 'I threw it.' His gun, hat and keys were thereafter found nearby." (*Brown I, supra*, 46 Cal.3d at pp. 440–441.)

At trial, "experts testified defendant's fingerprints were found on internal parts of the recovered weapon that could be reached only by disassembling the handle of the gun, and that the weapon found was probably the murder weapon." (*Brown I, supra*, 46 Cal.3d at p. 441.) In addition, ammunition found in defendant's pockets was similar to the ammunition in the gun. At the time of his arrest, defendant gave the police the name of Gordon Mink, the alias he had been using for some time. According to those who processed him at the jail, he appeared lucid, aware of surrounding events, and responsive to directions. Nothing in his behavior indicated he might be under the influence of any drug.

The defense was diminished capacity. A preliminary drug screening test was positive for phencyclidine (PCP), and an expert witness opined defendant had PCP in his blood at the time of the killing. Based on defendant's statement that he had ingested lysergic acid diethylamide (LSD), PCP, and methamphetamine prior to and on the day of the shooting, a forensic psychiatric expert

testified to a significant possibility defendant's mental state was impaired due to drug intoxication. The defense also presented some evidence suggesting third party culpability.

In rebuttal, the prosecution submitted test results showing negative for all drugs, including PCP and methamphetamine.

### B. *Penalty Phase Evidence*

The prosecution offered evidence of two prior felony convictions in 1969, one for breaking and entering and one for aggravated battery.

Evidence of four incidents involving force or violence was also presented. Robert Paulk testified that in 1969, when he was on uniformed patrol duty as a Vero Beach police officer, defendant attempted to run him down with a vehicle when Paulk approached to discuss an expired registration tag. In 1978, defendant assaulted Frank Veitenheimer with a heavy object outside a bar, shattering his eye orbit and breaking his nose. Veitenheimer required several weeks of hospitalization as well as surgery. In 1980, while incarcerated in county jail, defendant forced another inmate, James Brummel, to commit an act of oral copulation. In 1981, also while incarcerated in county jail, defendant stole a pair of wire cutters from fellow inmate Kevin Burbridge, who possessed them because his jaw had been wired closed to repair a break.

The defense offered testimony from two of defendant's uncles concerning difficulties in his youth, including physical and psychological abuse by his alcoholic father. Based on a review of medical records, declarations by relatives, and prison records, Dr. David Foster, a neuropsychiatrist, testified, among other things, that defendant had brain damage and suffered from posttraumatic stress disorder as well as bipolar disorder.

## II. Discussion

### A. *Guilt Phase Issues*

#### 1. *Reasonable doubt instruction*

At the time defendant committed his crimes in 1980 and at his first trial in 1982, the standard reasonable doubt instruction provided: "A defendant in a criminal action is presumed to be innocent until the contrary is proved, and in the case of a reasonable doubt whether his guilt is satisfactorily shown, he is entitled to a verdict of not guilty. This presumption places upon the State the burden of proving him guilty beyond a reasonable doubt. [¶] Reasonable

doubt is defined as follows: It is not a mere possible doubt; because everything relating to human affairs, and depending on moral evidence, is open to some possible or imaginary doubt. It is that state of the case which, after the entire comparison and consideration of all the evidence, leaves the minds of the jurors in that condition that they cannot say they feel an abiding conviction, to a moral certainty, of the truth of the charge." (CALJIC No. 2.90 (4th ed. 1979); see Stats. 1927, ch. 604, § 1, p. 1039.) At his retrial, defendant requested the court give this same version. Instead, the court instructed the jury according to the current version, which omits reference to "moral evidence" and "moral certainty": "A defendant in a criminal action is presumed to be innocent until the contrary is proved, and in the case of a reasonable doubt whether his guilt is satisfactorily shown, he is entitled to a verdict of not guilty. This presumption places upon the People the burden of proving him guilty beyond a reasonable doubt. [¶] Reasonable doubt is defined as follows: It is not a mere possible doubt; because everything relating to human affairs is open to some possible or imaginary doubt. It is that state of the case which, after the entire comparison and consideration of all the evidence, leaves the minds of the jurors in that condition that they cannot say they feel an abiding conviction of the truth of the charge." (CALJIC No. 2.90 (7th ed. 2003); see Pen. Code, § 1096.)

■ Characterizing the current version of CALJIC No. 2.90 as a " 'weaker' definition of reasonable doubt," defendant contends its use violated various constitutional rights, in particular the proscription against ex post facto laws and the correlative right to due process. At the outset, we question the premise of defendant's argument—that CALJIC instructions come within the purview of the ex post facto clause. That provision prohibits any legislative act that criminalizes conduct innocent when done, makes a crime greater than when done, increases or changes the punishment, or alters the rules of evidence to permit conviction on lesser or different evidence than when the crime was committed. (*Carmell v. Texas* (2000) 529 U.S. 513, 522–525 [146 L.Ed.2d 577, 120 S.Ct. 1620].) On its face the ex post facto clause operates as a check only on the exercise of legislative power, but similar limitations apply to judicial enlargement of a criminal act under principles of due process. (*Bouie v. Columbia* (1964) 378 U.S. 347 [12 L.Ed.2d 894, 84 S.Ct. 1697]; see *In re Baert* (1988) 205 Cal.App.3d 514, 517–519 [252 Cal.Rptr. 418].)

■ In contrast to legislative enactments or judicial decisions, the California Jury Instructions, Criminal (CALJIC) does not have the force of law. (*People v. Alvarez* (1996) 14 Cal.4th 155, 217 [58 Cal.Rptr.2d 385, 926 P.2d 365]; see *People v. Runnion* (1994) 30 Cal.App.4th 852, 858 [36 Cal.Rptr.2d 203].) Rather, "[i]t may be described as a semiofficial form book" containing "carefully drafted statements . . . generally accepted as accurate and safe to use. Moreover, an active editorial committee keeps abreast of new decisions

and prepares changes and revisions for supplements of the work." (5 Witkin & Epstein, Cal. Criminal Law (3d ed. 2000) Criminal Trial, § 627, p. 893.) Thus, modification of a particular instruction only reflects judicial action that may come within the purview of due process for retroactive application; it does not constitute such judicial action itself.

The revision of CALJIC No. 2.90 illustrates this point. The CALJIC committee modified the instruction in response to *Victor v. Nebraska* (1994) 511 U.S. 1 [127 L.Ed.2d 583, 114 S.Ct. 1239] and *People v. Freeman* (1994) 8 Cal.4th 450 [34 Cal.Rptr.2d 558, 882 P.2d 249]. (See *People v. Aguilar* (1997) 58 Cal.App.4th 1196, 1208 [68 Cal.Rptr.2d 619].) In *Victor v. Nebraska*, the defendant challenged the references to "moral evidence" and "moral certainty." The high court upheld the constitutionality of CALJIC No. 2.90 but did not condone retention of these references because their common meaning had changed since the instruction's original formulation, "and it may continue to do so to the point that it conflicts with the *Winship* [reasonable doubt] standard [(*In re Winship* (1970) 397 U.S. 358 [25 L.Ed.2d 368, 90 S.Ct. 1068])]." (*Victor*, at p. 16.) In *People v. Freeman*, this court as well noted that in light of *Victor v. Nebraska*, "today it might be more perilous for trial courts *not* to modify [CALJIC No. 2.90] in a narrow and specific manner . . . ." (*Freeman*, at p. 504.) Appendix B to the 7th edition of CALJIC, containing the history of the reasonable doubt instruction, cites both *Victor v. Nebraska* and *People v. Freeman* as the genesis of the current version. (CALJIC, *supra*, appen. B, pp. 519, 524.)

■ Since CALJIC instructions do not constitute legislative or decisional law and thus cannot implicate ex post facto concerns or due process, defendant's only argument is that the revised CALJIC No. 2.90 is itself defective. The analysis in *Victor v. Nebraska, supra*, 511 U.S. 1, rebuts this contention. ■ As we explained in *People v. Freeman, supra*, 8 Cal.4th at page 503, the high court "concluded that although the questioned terms add nothing of value to the instruction, they do not render it unconstitutional." If the inclusion of "moral evidence" and "moral certainty" adds nothing of value, then plainly their exclusion can take away nothing of value. Moreover, the court expressly stated, "An instruction cast in terms of an abiding conviction as to guilt, without reference to moral certainty, correctly states the government's burden of proof. [Citation.]" (*Victor*, at pp. 14–15.) Defendant therefore has no basis for complaint.[2] (See *People v. Aguilar, supra*, 58 Cal.App.4th at pp. 1207–1209.)

---

[2] For these same reasons, we would reject defendant's argument even if it were premised on the Legislature's deletion of "moral evidence" and "moral certainty" from section 1096, on which the CALJIC committee in part relied in revising CALJIC No. 2.90. (See Use Note to CALJIC No. 2.90 (7th ed. 2003) p. 94.) In addition, trial courts are not mandated to instruct in the terms of section 1096. (See § 1096a; *People v. Freeman, supra*, 8 Cal.4th at pp. 503–504.)

## 2. *CALJIC No. 17.41.1*

Over defendant's objection, the trial court instructed the jury pursuant to CALJIC No. 17.41.1, which provides: "The integrity of a trial requires that jurors, at all times during their deliberations, conduct themselves as required by these instructions. Accordingly, should it occur that any juror refuses to deliberate or expresses an intention to disregard the law or to decide that case based on penalty or punishment, or any other improper basis, it is the obligation of the other jurors to immediately advise the court of the situation." Defendant contends the instruction was erroneous because it undermined his right to a trial by jury, to due process, and to a unanimous verdict. (U.S. Const., Amends. VI, XIV; Cal. Const., art. I, § 16; see *People v. Gainer* (1977) 19 Cal.3d 835, 848–849 [139 Cal.Rptr. 861, 566 P.2d 997].)

In *People v. Engelman* (2002) 28 Cal.4th 436 [121 Cal.Rptr.2d 862, 49 P.3d 209], this court addressed the propriety of giving CALJIC No. 17.41.1. We acknowledged that the instruction "creates a risk to the proper functioning of jury deliberations and that it is unnecessary and inadvisable to incur this risk" (*Engelman*, at p. 449), but nevertheless found no constitutional infirmity with respect to either the right to trial by jury or to a unanimous verdict. (*Id.* at pp. 439–440.) In particular, we rejected the analogy—also drawn by defendant here—to the "dynamite" instruction disapproved in *People v. Gainer, supra*, 19 Cal.3d 835. "CALJIC No. 17.41.1 does not share the flaws we identified in *Gainer*. The instruction is not directed at a deadlocked jury and does not contain language suggesting that jurors who find themselves in the minority, as deliberations progress, should join the majority without reaching an independent judgment. The instruction does not suggest that a doubt may be unreasonable if not shared by a majority of the jurors, nor does it direct that the jury's deliberations include such an extraneous factor. CALJIC No. 17.41.1 simply does not carry the devastating coercive charge that we concluded should make us 'uncertain of the accuracy and integrity of the jury's stated conclusion' and uncertain whether the instruction may have ' "operate[d] to displace the independent judgment of the jury in favor of considerations of compromise and expediency." ' [Citation.]" (*Engelman*, at pp. 444–445.)

Defendant makes no argument warranting reconsideration of our conclusions. Nor does he cite anything in the record indicating the jurors in his case were improperly influenced by the instruction in their deliberations. (See *People v. Ortiz* (2003) 109 Cal.App.4th 104, 119, fn. 7 [134 Cal.Rptr.2d 467].) Accordingly, we find no error.

### B. *Penalty Phase Issues*

#### 1. *Victim impact evidence*

##### a. *Ex post facto*

Prior to commencement of the penalty phase, defense counsel moved to exclude victim impact evidence on the ground its admission would violate the proscription against ex post facto laws because such evidence was not admissible at the time defendant committed his crimes. (See *People v. Boyd* (1985) 38 Cal.3d 762, 775–776 [215 Cal.Rptr. 1, 700 P.2d 782].) The trial court declined to do so, and defendant now argues the ruling was constitutional error.

In California, the admissibility of victim impact evidence is governed by judicial construction of the state's death penalty law, not by statute. (See *People v. Edwards* (1991) 54 Cal.3d 787, 833–834 [1 Cal.Rptr.2d 696, 819 P.2d 436].) Accordingly, the due process clause rather than the ex post facto clause controls our analysis. (See generally *In re Baert, supra,* 205 Cal.App.3d at pp. 517–519.) Under either provision, however, defendant's argument fails.

In *Carmell v. Texas, supra,* 529 U.S. 513, the United States Supreme Court reaffirmed a long-standing principle of ex post facto jurisprudence: " 'Statutes which simply enlarge the class of persons who may be competent to testify in criminal cases are not *ex post facto* in their application to prosecutions for crimes committed prior to their passage; for they do not attach criminality to any act previously done, and which was innocent when done; nor aggravate any crime theretofore committed; nor provide a greater punishment therefor than was prescribed at the time of its commission; *nor do they alter the degree, or lessen the amount or measure, of the proof which was made necessary to conviction when the crime was committed.*

" '. . . [A]lterations which do not increase the punishment, nor change the ingredients of the offence or the ultimate facts necessary to establish guilt, but—leaving untouched the nature of the crime and the amount or degree of proof essential to conviction—only remove existing restrictions upon the competency of certain classes of persons as witnesses, relate to modes of procedure only, in which no one can be said to have a vested right, and which the State, upon grounds of public policy, may regulate at pleasure. Such regulations of the mode in which the facts constituting guilt may be placed before the jury, can be made applicable to prosecution or trials thereafter had, without reference to the date of the commission of the offence charged.' " (*Carmell v. Texas, supra,* 529 U.S. at pp. 543–544, quoting *Hopt v. Territory of Utah* (1884) 110 U.S. 574, 589–590 [28 L.Ed. 262, 4 S.Ct. 202].)

■ In the context of victim impact evidence, this principle has consistently been held to permit admission even when the basis, usually statutory, postdated the defendant's crimes. " '[V]ictim impact evidence is simply another form or method of informing the sentencing authority about the specific harm caused by the crime in question, evidence of a general type long considered by sentencing authorities.' [Citation.]" (*Neill v. Gibson* (10th Cir. 2001) 278 F.3d 1044, 1052, quoting *Payne v. Tennessee* (1991) 501 U.S. 808, 825 [115 L.Ed.2d 720, 111 S.Ct. 2597].) "Further, the [court in *Thompson v. Missouri* (1898) 171 U.S. 380 [43 L.Ed. 204, 18 S.Ct. 922]] indicated it could not 'perceive any ground upon which to hold a statute to be *ex post facto* which does nothing more than admit evidence of a particular kind in a criminal case upon an issue of fact which was not admissible under the rules of evidence as enforced by judicial decisions at the time the offence was committed . . . . The statute [at issue] did nothing more than remove an obstacle . . . that withdrew from the consideration of the jury testimony which, in the opinion of the legislature, tended to elucidate the ultimate, essential fact to be established . . . .' " (*Neill*, at p. 1052.) Simply put, even in the context of victim impact evidence, "the fact that a statute works to a defendant's disadvantage does not constitute an *ex post facto* violation. [Citation.]" (*State v. Muhammad* (1996) 145 N.J. 23 [678 A.2d 164, 181]; see *Collins v. Youngblood* (1990) 497 U.S. 37, 50 [111 L.Ed.2d 30, 110 S.Ct. 2715]; *Washington v. Murray* (4th Cir. 1991) 952 F.2d 1472, 1480; *Livingston v. State* (1994) 264 Ga. 402 [444 S.E.2d 748, 752]; *State v. Clark* (1999) 1999 NMSC 35 [128 N.M. 119, 990 P.2d 793, 809]; *Mitchell v. State* (1994) 1994 OKCR 70 [884 P.2d 1186, 1204]; see also *Davis v. State* (Ind. 1993) 598 N.E.2d 1041, 1051.)

Thus, even assuming decisional law imposed greater restriction on the admissibility of victim impact evidence at the time of defendant's crimes in comparison to the time of trial, the application of current law had no constitutional significance.

b. *Evidence Code section 352 and Payne v. Tennessee*

In addition to objecting to victim impact evidence on ex post facto grounds, defendant argued the evidence should be excluded as more prejudicial than probative under Evidence Code section 352, as well as outside the scope of *Payne v. Tennessee*, *supra*, 501 U.S. 808, thus violating his right to due process and a reliable penalty determination.

In *Payne v. Tennessee*, the United States Supreme Court partially overruled *Booth v. Maryland* (1987) 482 U.S. 496 [96 L.Ed.2d 440, 107 S.Ct. 2529] and *South Carolina v. Gathers* (1989) 490 U.S. 805 [104 L.Ed.2d 876, 109 S.Ct. 2207], which had categorically foreclosed both evidence and argument

regarding victim impact. Instead, the court held "that if the State chooses to permit the admission of victim impact evidence and prosecutorial argument on that subject, the Eighth Amendment erects no *per se* bar." (*Payne v. Tennessee, supra*, 501 U.S. at p. 827.) "[A] State may properly conclude that for the jury to assess meaningfully the defendant's moral culpability and blameworthiness, it should have before it at the sentencing phase evidence of the specific harm caused by the defendant. '[T]he State has a legitimate interest in counteracting the mitigating evidence which the defendant is entitled to put in, by reminding the sentencer that just as the murderer should be considered as an individual, so too the victim is an individual whose death represents a unique loss to society and in particular to his family.' [Citation.]" (*Id.* at p. 825.)

In *People v. Edwards, supra*, 54 Cal.3d 787, this court explained the effect of this reversal on California death penalty law. Although victim impact is not expressly enumerated as a statutory aggravating factor, we concluded such evidence was generally admissible as a circumstance of the crime under section 190.3, factor (a).[3] (*Edwards*, at p. 833.) "The word 'circumstances' as used in factor (a) of section 190.3 does not mean merely the immediate temporal and spatial circumstances of the crime. Rather it extends to '[t]hat which surrounds materially, morally, or logically' the crime. [Citation.] The specific harm caused by the defendant does surround the crime 'materially, morally, or logically.' " (*Ibid.*) " '[A]t the penalty phase the jury decides a question the resolution of which turns not only on the facts, but on the jury's moral assessment of those facts as they reflect on whether defendant should be put to death. It is not only appropriate, but necessary, that the jury weigh the sympathetic elements of defendant's background against those that may offend the conscience. [Citations.]' " (*Id.* at p. 834, quoting *People v. Haskett* (1982) 30 Cal.3d 841, 863–864 [180 Cal.Rptr. 640, 640 P.2d 776].) In sum, "the injury inflicted is generally a circumstance of the crime as that phrase is commonly understood. We need not divorce the injury from the acts." (*Edwards*, at p. 835.) This holding was not without limits, however, and "only encompasses evidence that logically shows the harm caused by the defendant." (*Ibid.*; see also *Payne v. Tennessee, supra*, 501 U.S. at p. 825 [due process prohibits the introduction of victim impact evidence "so unduly prejudicial that it renders the trial fundamentally unfair"].)

With these guiding considerations in mind, we turn to the specific evidence at issue, keeping in mind that at the penalty phase defendant offered section 190.3, factor (k) testimony describing an abusive and troubled childhood, in

---

[3] It is not entirely clear from the record that defendant specifically objected to the victim impact evidence as not within the scope of factor (a) and the rationale of *Edwards*; however, respondent does not argue waiver. In light of our disposition on the merits, we need not definitely resolve this procedural point.

addition to a psychiatrist's opinion he suffered from posttraumatic stress disorder and other mental disorders, and guilt phase evidence he acted under the influence of drugs.

■ The prosecution's evidence generally fell into two categories: testimony by the surviving assault victims, John Terezia, Officer Henninger, and Officer Overly and testimony from Officer Reed's family members. With regard to the assault victims' own injuries, we have held such evidence admissible under section 190.3, factor (b). (*People v. Taylor* (2001) 26 Cal.4th 1155, 1172 [113 Cal.Rptr.2d 827, 34 P.3d 937]; see *People v. Benson* (1990) 52 Cal.3d 754, 795–797 [276 Cal.Rptr. 827, 802 P.2d 330].) "If victim impact evidence is permitted under factor (b), it should certainly be permitted under factor (a)." (*People v. Edwards, supra,* 54 Cal.3d at p. 835.) Defendant objects, however, that because the retrial occurred 20 years after the crimes, the additional testimony as to how the witnesses were coping with what happened the night of the murder and were still suffering from their injuries was irrelevant and highly prejudicial. Defendant cites no authority or rationale for temporally circumscribing the scope of victim impact evidence as he proposes. (See *id.* at p. 833.) Indeed, it is only logical that the effects, both psychological and physical, of a violent and murderous assault such as defendant's would be enduring. As a direct result of defendant's crimes, such effects are plainly relevant (*People v. Mitcham* (1992) 1 Cal.4th 1027, 1062–1063 [5 Cal.Rptr.2d 230, 824 P.2d 1277]); and we find nothing in the particular testimony unduly inflammatory or otherwise prejudicial. (*Ibid.*; see *People v. Brown* (2003) 31 Cal.4th 518, 573 [3 Cal.Rptr.3d 145, 73 P.3d 1137]; see also *People v. Marks* (2003) 31 Cal.4th 197, 235–236 [2 Cal.Rptr.3d 252, 72 P.3d 1222].) Moreover, Henninger testified that the incident had had a positive effect on his day-to-day living and that he had "moved forward with what was important to me and to the community and to my family." Overly similarly felt that "it had actually helped me to become a better police officer because I realize through the activity that night things that I needed to do that . . . enhanced my abilities to be a better police officer." Also in a positive vein, Terezia, who had been shot between the eyes and required several years of rehabilitation to relearn basic functions, had been assisted in the process by his wife, who would not let him feel sorry for himself. Defendant contends testimony by Terezia's wife was irrelevant because she herself had not been a crime victim. While not a direct victim of the assault, she was a witness to the impact on Terezia, and her testimony was limited to giving additional details about his rehabilitation.

With regard to testimony by Reed's surviving family members, we find nothing in their testimony that went beyond the scope of admissible victim impact testimony under *People v. Edwards, supra,* 54 Cal.3d 787. For the most part, their testimony concerned either the immediate effects of the murder—such as Linda Reed's description of the circumstances the night of

the killing when she was informed of the death of her husband and Randell Novell's recounting the next day seeing newspaper headlines of the incident—or the residual and lasting impact they continued to experience—such as Novell's feelings when passing his brother's grave. (See *People v. Pollock* (2004) 32 Cal.4th 1153, 1182 [13 Cal.Rptr.3d 34, 89 P.3d 353]; *People v. Boyette* (2002) 29 Cal.4th 381, 444–445 [127 Cal.Rptr.2d 544, 58 P.3d 391].) To the extent they also recollected past incidents or activities they shared with Reed, their testimony simply served to explain why they continued to be affected by his loss and to show the "victim's 'uniqueness as an individual human being,' whatever the jury might think the loss to the community resulting from his death might be." (*Payne v. Tennessee, supra,* 501 U.S. at p. 823.) In this regard, the United States Supreme Court in *Payne* acknowledged that just as the defendant is entitled to be humanized, so too is the victim: " '[J]ustice, though due to the accused, is due to the accuser also. The concept of fairness must not be strained till it is narrowed to a filament. We are to keep the balance true.' " (*Id.* at p. 827, quoting *Snyder v. Massachusetts* (1934) 291 U.S. 97, 122 [78 L.Ed. 674, 54 S.Ct. 330] (maj. opn. of Cardozo, J.); see also *Pollock,* at p. 1182.)

 Defendant contends Novell's testimony about his custom of saluting his brother's grave every time he drives past the cemetery and Reed's father's testimony he has not gone fishing since his son's death constituted inadmissible evidence. We consider these simply manifestations of the psychological impact experienced by the victims, in no way inconsistent with our prior decisions nor "fundamentally unfair" within the meaning of *Payne v. Tennessee, supra,* 501 U.S. at page 825. Each in its own respect, these responses are understandable human reactions, particularly Novell's given the circumstances of the crime—a police officer deliberately killed in the line of duty. Defendant further argues that the Reed family members were not direct witnesses to the crime and for that reason should not have been permitted to testify. We find no authority for such a rule, which would eliminate the vast majority of victim impact evidence in murder cases—a result inconsistent with the underlying rationale of *Payne v. Tennessee, supra,* 501 U.S. 808, 819, that "the assessment of harm caused by the defendant as a result of the crime charged has understandably been an important concern of the criminal law . . . ." In the case of murder, the "harm caused" will first and foremost be suffered by surviving family members.

### 2. *Prosecutorial misconduct*

Defendant contends the prosecutor committed misconduct in making certain arguments in favor of the death penalty. He failed to object to any portion of the argument or seek a curative admonition and therefore has

waived the issue on appeal. (*People v. Ashmus* (1991) 54 Cal.3d 932, 989 [2 Cal.Rptr.2d 112, 820 P.2d 214].) Even disregarding this procedural default, we find no error.

The prosecutor told the jury: "What I am saying is this: If you kill a police officer, a good police officer in the performance of his duties, his duties to keep us safe—you folks parked in the jury parking lot. People are out there walking around, the whole county right now, if you stop—let me just take a little liberty with you. Let's stop right now. Everybody that is moving everywhere in Orange County and, then we say (snaps fingers), you can move now, their freedom is dependent upon police officers. Because if you don't have a policeman out there, or at least a criminal that has no rights—no feeling about the rights of anyone, if you don't have a policeman to deter that guy, we don't have freedom, if you think about it. And that is what Don Reed stood for. He stood for our freedom. He was there basically enforcing the laws that allowed us—that allows us to move about free."

In addition, the prosecutor quoted Randell Novell's testimony regarding an incident in which Novell " 'was driving home from work one day, and I saw a guy on a Harley Davidson motorcycle with long hair and tattoos. And I pulled up next to the guy, and I was within a hair of just turning left into him. And I thought, "I can't do it. I have children. I have a wife. I can't do it." But that [is the] kind of uncontrollable anger that you have to control. [¶] I never had those thoughts since or ever before that, but it was very difficult, very difficult time. And that kind of anger dispels itself and it becomes a great cloud of sadness. It is not there every day, but it is for me. It is there more days than others because I drive by Donny's grave probably two or three times a week. And I always salute his grave when I drive by because I have a great deal of respect for what he did . . . .' " He also recalled testimony about Novell's feelings for his brother: " 'Well, he gave his life, for the people of Garden Grove. [Defendant] chose to use the death penalty on my brother and penalize him for trying to protect the citizens and killed him. For that I salute him. I salute my brother's bravery.' " The prosecutor then followed with his own words: "It says it all. Don Reed that day put on that uniform to protect us and to enforce the law. It is now your turn. The . . . law is [CALJIC No.] 8.85 and the law is loading that balance beam objectively. [¶] And quite frankly, Don Reed did it for us, and I salute Don Reed. You can salute Don Reed by applying the law."

We find nothing objectionable in these remarks. " '[A] prosecutor is given wide latitude during argument. The argument may be vigorous as long as it amounts to fair comment on the evidence, which can include reasonable inferences, or deductions to be drawn therefrom. [Citations.] It is also clear that counsel during summation may state matters not in evidence, but which

are common knowledge or are illustrations drawn from common experience, history or literature.' [Citation.] 'A prosecutor may "vigorously argue his case and is not limited to 'Chesterfieldian politeness' " [citation] . . . .' " (*People v. Wharton* (1991) 53 Cal.3d 522, 567–568 [280 Cal.Rptr. 631, 809 P.2d 290].) The arguments here did not exceed these bounds. Since, as previously discussed, the victim impact evidence was admissible, the prosecutor could recall that evidence and urge the jurors to rely on it in voting to impose the death penalty. (See *Payne v. Tennessee, supra*, 501 U.S. at p. 827; see also *People v. Sanders* (1995) 11 Cal.4th 475, 548–549 [46 Cal.Rptr.2d 751, 905 P.2d 420]; *People v. Kirkpatrick* (1994) 7 Cal.4th 988, 1017 [30 Cal.Rptr.2d 818, 874 P.2d 248]; *People v. Fierro* (1991) 1 Cal.4th 173, 235 [3 Cal.Rptr.2d 426, 821 P.2d 1302].) In doing so, he asked them to "salute Don Reed" not on the basis of inflammatory rhetoric or emotion but "by applying the law [set forth in CALJIC No. 8.85 enumerating the applicable statutory aggravating and mitigating circumstances]." In reminding the jurors that we all depend on not only the presence but the commitment of law enforcement officers to help ensure safe and peaceable communities, he did no more than draw from common experience.

### 3. CALJIC No. 17.41.1

At the penalty phase, the court instructed the jury that it should "be guided by the previous instructions given in the guilt phase of this trial which are applicable and pertinent to the determination of penalty." Defendant contends the inclusion of CALJIC No. 17.41.1 (see *ante*, at p. 393) infringed upon his constitutional rights because "[a] juror who was disinclined to impose the death penalty would have felt pressure, due to this erroneous instruction, to go along with the majority in 'saluting' Don Reed by voting for death or risk being reported to the court for failing to follow the law."

As previously discussed (see *ante*, at p. 393), CALJIC No. 17.41.1 is not constitutionally defective. (*People v. Engelman, supra*, 28 Cal.4th 436.) Defendant offers no basis for reconsidering this conclusion in the context of penalty deliberations. Moreover, "the sentencing function is inherently moral and normative, not factual." (*People v. Rodriguez* (1986) 42 Cal.3d 730, 779 [230 Cal.Rptr. 667, 726 P.2d 113].) As in this case, jurors are instructed to weigh the aggravating and mitigating circumstances and in doing so to "assign whatever moral or sympathetic value you deem appropriate to each and all of the various factors you are permitted to consider. . . . To return a judgment of death, each of you must be persuaded that the aggravating circumstances are so substantial in comparison with the mitigating circumstances that it warrants death instead of life without parole." (CALJIC No. 8.88 (7th ed. 2003).) These instructions plainly inform the jurors of the

nature of their task and the basis on which they are to determine the appropriate penalty. (Cf. *Engelman,* at p. 444.) Defendant's speculation that the court's oblique reference to CALJIC No. 17.41.1 interfered with this process is just that, speculation. We find no error.

### 4. *Constitutionality of California's death penalty statute*

Defendant raises a number of constitutional challenges to California's death penalty statute, claims we have consistently rejected and find no persuasive reason to reexamine.

Accordingly, we continue to hold:

 (1) The death penalty law adequately narrows the class of death-eligible offenders. (*People v. Prieto* (2003) 30 Cal.4th 226, 276 [133 Cal.Rptr.2d 18, 66 P.3d 1123].)

 (2) Consideration of the circumstances of the crime under section 190.3, factor (a) does not result in arbitrary or capricious imposition of the death penalty. (*People v. Prieto, supra,* 30 Cal.4th at p. 276; see *Tuilaepa v. California* (1994) 512 U.S. 967, 987–988 [129 L.Ed.2d 750, 114 S.Ct. 2630].) Defendant's argument that a seemingly inconsistent range of circumstances can be culled from death penalty decisions proves too much. What this reflects is that each case is judged on its facts, each defendant on the particulars of his offense. Contrary to defendant's position, a statutory scheme would violate constitutional limits if it did not allow such individualized assessment of the crimes but instead mandated death in specified circumstances. (See generally *Lockett v. Ohio* (1978) 438 U.S. 586, 602–606 [57 L.Ed.2d 973, 98 S.Ct. 2954].)

 (3) The death penalty law is not unconstitutional for failing to impose a burden of proof—whether beyond a reasonable doubt or by a preponderance of the evidence—as to the existence of aggravating circumstances, the greater weight of aggravating circumstances over mitigating circumstances, or the appropriateness of a death sentence. (*People v. Jenkins* (2000) 22 Cal.4th 900, 1054 [95 Cal.Rptr.2d 377, 997 P.2d 1044].) Unlike the statutory schemes in other states cited by defendant, in California " 'the sentencing function is inherently moral and normative, not factual' [citation] and, hence, not susceptible to a burden-of-proof quantification." (*People v. Hawthorne* (1992) 4 Cal.4th 43, 79 [14 Cal.Rptr.2d 133, 841 P.2d 118]; see also *People v. Prieto, supra,* 30 Cal.4th at pp. 262–263.)

■ (4) The jury is not constitutionally required to achieve unanimity as to aggravating circumstances. (*People v. Jenkins, supra,* 22 Cal.4th at p. 1053.)

Recent United States Supreme Court decisions in *Apprendi v. New Jersey* (2000) 530 U.S. 466 [147 L.Ed.2d 435, 120 S.Ct. 2348] and *Ring v. Arizona* (2002) 536 U.S. 584 [153 L.Ed.2d 556, 122 S.Ct. 2428] have not altered our conclusions regarding burden of proof or jury unanimity. (See *People v. Prieto, supra,* 30 Cal.4th at p. 275.)

■ (5) The absence of a requirement the jury make written findings does not render the law unconstitutional. (*People v. Jenkins, supra,* 22 Cal.4th at p. 1053.)

■ (6) Nor is it defective in failing to require intercase proportionality review. (*People v. Prieto, supra,* 30 Cal.4th at p. 276.)

■ (7) The jury may properly consider evidence of unadjudicated criminal activity involving force or violence under factor (b) of section 190.3 and need not make a unanimous finding on factor (b) evidence. (*People v. Anderson* (2001) 25 Cal.4th 543, 584 [106 Cal.Rptr.2d 575, 22 P.3d 347]; see *People v. Prieto, supra,* 30 Cal.4th at p. 263.) Contrary to defendant's implication, "the court must instruct, on its own motion, ·that no juror may consider any alleged other violent crime in aggravation of penalty unless satisfied beyond a reasonable doubt that the defendant committed it [citations]." (*Anderson,* at p. 584.)

■ (8) "[T]he use of certain adjectives—i.e., ' "extreme" ' and ' "substantial" '—in the list of mitigating factors does not render the statute unconstitutional [citation]." (*People v. Prieto, supra,* 30 Cal.4th at p. 276.)

■ (9) The trial court is not required to instruct that certain statutory factors can only be considered in mitigation. (*Tuilaepa v. California, supra,* 512 U.S. at p. 979.) Since there is no requirement that the court identify which factors are aggravating and which are mitigating (see, e.g., *People v. Catlin* (2001) 26 Cal.4th 81, 178 [109 Cal.Rptr.2d 31, 26 P.3d 357]), neither must it restrict the jurors' consideration of the evidence in this regard. (See *People v. Zapien* (1993) 4 Cal.4th 929, 990 [17 Cal.Rptr.2d 122, 846 P.2d 704].)

■ (10) Death penalty defendants are not denied equal protection because the statutory scheme does not contain disparate sentence review. (*People v. Jenkins, supra,* 22 Cal.4th at p. 1053; *People v. Allen* (1986) 42 Cal.3d 1222, 1286–1288 [232 Cal.Rptr. 849, 729 P.2d 115].)

(11) Nor is the law constitutionally deficient because the prosecutor retains discretion whether or not to seek the death penalty. (*People v. Ochoa* (2001) 26 Cal.4th 398, 462 [110 Cal.Rptr.2d 324, 28 P.3d 78].)

(12) The prosecution's use of peremptory challenges to remove prospective jurors who express scruples about imposing the death penalty does not violate any constitutional guarantee. (*People v. Cox* (1991) 53 Cal.3d 618, 648–649 [280 Cal.Rptr. 692, 809 P.2d 351].) Nor does the fact that we generally leave to the judgment of the trial court the determination whether a prospective juror's attitude toward imposing the death penalty will support an excusal for cause. (See *Wainwright v. Witt* (1985) 469 U.S. 412, 424–429 [83 L.Ed.2d 841, 105 S.Ct. 844].)

(13) The fact that trial judges are elected does not undermine their fairness or impartiality when ruling on penalty modification applications pursuant to Penal Code section 190.4, subdivision (e). (See Evid. Code, § 664; *People v. Coddington* (2000) 23 Cal.4th 529, 644–645 [97 Cal.Rptr.2d 528, 2 P.3d 1081]; *People v. Visciotti* (1992) 2 Cal.4th 1, 49 [5 Cal.Rptr.2d 495, 825 P.2d 388]; see also *DePew v. Anderson* (6th Cir. 2002) 311 F.3d 742, 752–753; *Stretton v. Disciplinary Bd. of Supreme Court of Pennsylvania* (3d Cir. 1991) 944 F.2d 137, 142.)

(14) The use of victim impact evidence is constitutionally permissible. (*Payne v. Tennessee*, *supra*, 501 U.S. at p. 822.)

5. *Alleged violation of international law*

Defendant further argues that California's death penalty statute is unconstitutional because the use of the death penalty as a regular form of punishment falls short of international norms of humanity and decency. In a related vein, he contends that the statute violates international law as set forth in the International Covenant on Civil and Political Rights (ICCPR) and that use of the death penalty violates international standards because only a small minority of countries consider death an appropriate form of punishment.

Setting aside whether defendant has standing to invoke the terms of an international treaty in this circumstance (see, e.g., *Hanoch Tel-Oren v. Libyan Arab Republic* (D.D.C. 1981) 517 F.Supp. 542, 545–547), we question whether defendant's argument regarding the ICCPR fails at its premise. Although the United States is a signatory, it signed the treaty on the express condition "[t]hat the United States reserves the right, subject to its Constitutional constraints, to impose capital punishment on any person (other than a

pregnant woman) duly convicted under existing or future laws permitting the imposition of capital punishment, including such punishment for crimes committed by persons below eighteen years of age." (138 Cong. Rec. S4781-01 (Apr. 2, 1992); see Comment, *The Abolition of the Death Penalty: Does "Abolition" Really Mean What You Think It Means?* (1999) 6 Ind. J. Global Legal Studies 721, 726 & fn. 33.) Given states' sovereignty in such matters within constitutional limitations, our federal system of government effectively compelled such a reservation.

In any event, we have previously considered and rejected the various permutations of defendant's arguments. (See *People v. Hillhouse* (2002) 27 Cal.4th 469, 511 [117 Cal.Rptr.2d 45, 40 P.3d 754]; *People v. Jenkins, supra,* 22 Cal.4th at p. 1055; see also *People v. Ghent* (1987) 43 Cal.3d 739, 778–779 [239 Cal.Rptr. 82, 739 P.2d 1250] (maj. opn. of Lucas, C. J.); *id.* at pp. 780–781 (conc. opn. of Mosk, J.).) As succinctly stated in *People v. Hillhouse,* at page 511: "International law does not prohibit a sentence of death rendered in accordance with state and federal constitutional and statutory requirements. [Citations.]" Since we find no other defect in imposing the death penalty against defendant, we decline to find the law defective based on any provision of international law.

### 6. *Delay in carrying out execution*

 Defendant contends the delay in his execution—he has spent almost two decades on death row—constitutes a denial of due process and cruel and unusual punishment under the federal and state Constitutions. (See, e.g., *Lackey v. Texas* (1995) 514 U.S. 1045 [131 L.Ed.2d 304, 115 S.Ct. 1421] (mem. opn. of Stevens, J., on denial of cert.).) This delay has been attributable not only to the normal postconviction review process but also the fact that defendant obtained a new trial when this court granted relief on habeas corpus. As explained in *People v. Anderson, supra,* 25 Cal.4th at page 606, "we have consistently concluded, both before and since *Lackey,* that delay inherent in the automatic appeal process is not a basis for concluding that either the death penalty itself, or the process leading to its execution, is cruel and unusual punishment. [Citations.]" Defendant presents no reason for reexamining this determination, particularly under circumstances in which he has benefited from that process in the form of a new trial. As previously discussed, any reliance on international law or extraterritorial decisional law has no bearing on the validity of a death sentence that satisfies federal and state constitutional mandates. (See *ante,* at p. 403.)

### 7. *Cumulative error*

Since we find no error, we reject defendant's argument that any cumulative effect warrants reversal.

### C. *Sentencing Issues; Conduct Credits*

With respect to the sentence on his noncapital offenses, defendant was awarded credit for 7,237 actual days in custody. The defense requested the trial court award an additional 3,618 days of conduct credit (see § 4019) on the theory that because the prior judgment had been reversed, the court should consider the proceeding as an initial sentencing and treat defendant as if he had not been previously convicted and sentenced. The court declined and reserved the calculation of conduct credits for the Department of Corrections.

We recently rejected the argument that a defendant is entitled to additional days of credit in these circumstances in *In re Martinez* (2003) 30 Cal.4th 29 [131 Cal.Rptr.2d 921, 65 P.3d 411]. (See *People v. Buckhalter* (2001) 26 Cal.4th 20, 40, fn. 10 [108 Cal.Rptr.2d 625, 25 P.3d 1103].) There, the court concluded that for a defendant whose conviction is reversed on appeal, "prereversal prison time ought not be viewed as presentence custody, and . . . credit accrual should be calculated in accordance with [the defendant's] ultimate postsentence status." (*Martinez*, at p. 31.) Even though reversal sets the entire matter at large (cf. § 1180), the statutory scheme awards conduct credits based on the defendant's custodial status. Section 4019, subdivision (a)(4) authorizes credits only for confinement "in a county jail . . . following arrest and prior to the imposition of sentence for a felony conviction," not for postsentence confinement in state prison. "[T]he pre- and postsentence credit systems serve disparate goals and target persons who are not similarly situated. The presentence credit scheme, section 4019, focuses primarily on encouraging minimal cooperation and good behavior by persons temporarily detained in local custody before they are convicted, sentenced, and committed on felony charges. By contrast, the worktime credit scheme for persons serving prison terms emphasizes penological considerations, including the extent to which certain classes of prisoners, but not others, deserve or might benefit from incentives to shorten their terms through participation in rehabilitative work, education, and training programs . . . ." (*Buckhalter*, at p. 36; see *Martinez*, at p. 36.)

Accordingly, the trial court did not err in rejecting defendant's calculation of his custody credits.

## Disposition

The judgment is affirmed.

Kennard, Acting C. J., Baxter, J., Werdegar, J., Chin, J., Moreno, J., and Stein, J.,* concurred.

Appellant's petition for a rehearing was denied September 1, 2004. George, C. J., did not participate therein.

---

*Assigned by the Acting Chief Justice pursuant to article VI, section 6 of the California Constitution.